# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 30, 2021

Lyle W. Cayce
Clerk

No. 20-60056

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

OTHA RAY FLOWERS,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:19-CR-41-1

Before JONES, SMITH, and ELROD, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*:

Otha Ray Flowers, convicted of a federal gun violation, appeals the denial of his motion to suppress evidence as a violation of his Fourth Amendment rights. The questions on appeal are whether Flowers and Jeremy Mayo were "seized" when five or six patrol cars parked behind and around Mayo's Cadillac with their patrol lights flashing, and if they were seized, whether Officer Stanton had reasonable suspicion to conduct a

No. 20-60056

"Terry stop."[1]  Under the circumstances of this case and viewing the facts in the light most favorable to the Government, assuming arguendo that these individuals were seized, there was reasonable suspicion to do so.  We AFFIRM.

## I.

On Saturday, February 18, 2017, around 8:30 p.m., Officer Eric Stanton of the Jackson Police Department was patrolling an area of Jackson, Mississippi.  Officer Stanton was a member of the Direct Action Response Team (DART), a proactive unit tasked to "look[] for suspicious behavior, suspicious activities, traffic stops, [and] things of that nature . . . ."  On that night, Officer Stanton's supervisor had directed the DART to an area of Jackson, around Capitol Street and Road of Remembrance, where "recent violent crime and burglaries" had occurred.

---

[1] Flowers also seeks a new trial, because the prosecutor made several statements during closing arguments, which, he claims, constitute prosecutorial misconduct.  Our review is for abuse of discretion.  *United States v. Stephens*, 571 F.3d 401, 407 (5th Cir. 2009).  To determine whether there was prosecutorial misconduct, we ask whether (1) "the prosecutor made an improper remark" and (2) "the defendant was prejudiced." *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007) (quotation marks and citation omitted).  Prejudice is a "high bar," which is met only where "the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict."  *Id.* (quotation marks and citation omitted).  "To determine whether a remark prejudiced the defendant's substantial rights, we assess the magnitude of the statement's prejudice, the effect of any cautionary instructions given, and the strength of the evidence of the defendant's guilt." *United States v. Alaniz*, 726 F.3d 586, 615 (5th Cir. 2013) (quotation marks and citation omitted). Flowers objects to three statements:  The prosecutor said that (1) he didn't need to call any other officers to corroborate Stanton's testimony, (2) certain forensic tracing on spent ammunition was impossible when dealing with a revolver—a fact that was, allegedly, not in evidence—and (3) defense counsel sought evidence that only appears on TV shows.  The jury convicted Flowers of possession of a firearm that he was allegedly sitting on.  After reviewing the record and considering the relevant factors, we cannot conclude that any of those remarks casts serious doubt on the correctness of that verdict.

As Officer Stanton was turning from Capitol Street onto Road of Remembrance, he saw a silver Cadillac parked in the south end of a small parking lot connected to an open convenience store. It was dark outside, but Officer Stanton observed that the vehicle was occupied by two men, one in the driver's seat and one in the passenger's seat. Officer Stanton observed the vehicle "for approximately 10 to 15 seconds" and noticed the occupants "didn't appear to be exiting the vehicle, [and] didn't appear to be patronizing the establishment." Therefore, he decided to conduct what he characterized as a "field interview."

Officer Stanton testified that at this point, he and five to six other officers, all in separate patrol cars, converged upon the silver vehicle with their blue lights activated. The parking lot in front of the store was narrow, with very little space or room to maneuver. Officer Stanton later acknowledged that it would have been impossible for the silver vehicle to leave the parking lot because of the way the officers parked their cars around it.

Officer Stanton got out of his patrol car and approached the silver vehicle, as did other officers. He testified that the men in the vehicle were still free to leave at this point in the encounter, but he did not communicate that to them. Flowers, sitting in the driver's seat, did not attempt to flee. As Officer Stanton approached, Flowers lowered the driver's side window. With the window down, Officer Stanton reported smelling "what appeared to be the strong odor of marijuana coming from the vehicle." Officer Stanton asked Flowers for identification and Flowers provided his Mississippi driver's license. According to Officer Stanton, the passenger in the vehicle— Jeremy Mayo—then threw an object into his mouth. In response, Officer Stanton ordered both men to exit the Cadillac.

No. 20-60056

When Flowers stepped out of the vehicle, Officer Stanton saw in plain view a silver, .32-caliber revolver on the driver's seat where Flowers had been sitting.[2]  A criminal history check revealed that Flowers had an outstanding arrest warrant, and Officer Stanton placed him under arrest.  During a search incident to his arrest, Flowers stated that he had marijuana on him, and Officer Stanton recovered a small, clear plastic bag of marijuana from his front left pocket.  Officer Stanton identified this marijuana as the source of the odor he smelled upon approaching Flowers's driver-side window.

Flowers was charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  Before trial, Flowers moved to suppress evidence of the gun on the basis that the encounter with Flowers was a seizure that violated the Fourth Amendment.  The district court explained orally on the record his reasons for rejecting the motion.  The district court determined that there was "no evidence" that the "investigatory aspect of the initial approach of the officers ever evolved into a seizure."  Flowers proceeded to trial, and a jury convicted him.

## II.

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  Evidence seized in violation of the amendment may be excluded from introduction at trial.  A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and may only be undertaken if the law enforcement officer has reasonable suspicion to believe that a crime has occurred or is in the offing.  *Terry v. Ohio*, 392 U.S. 1, 30–31, 88 S. Ct. 1868, 1884–85 (1968)).  Importantly, however, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another

---

[2] Stanton found when he inspected it that the gun had five live rounds in it.

public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen…." *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983).

This court reviews the constitutionality of the *Terry* stop *de novo*. *United States v. Cervantes*, 797 F.3d 326, 328 (5th Cir. 2015). We review the findings of fact by the trial court for clear error, *id.*, and are bound by the court's credibility determinations. Moreover, we construe the evidence presented at the suppression hearing "in the light most favorable to the prevailing party"—here, the Government. *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002).

Because a seizure under the Fourth Amendment must be "justified at its inception," our first task is ordinarily to determine when the seizure occurred. *See United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (quotation marks and citation omitted). Flowers contends that he was seized at the outset of the police encounter, when the patrol cars surrounded the vehicle in which he was sitting. The government contends that the police encounter with Flowers was consensual, and a seizure did not occur until after Officer Stanton smelled marijuana from Flowers's open window, giving rise to probable cause for arrest.

A seizure occurs when, under the totality of the circumstances, a law enforcement officer, by means of physical force or show of authority, terminates or restrains a person's freedom of movement. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386 (1991). The test that applies in the absence of an unambiguous intent to restrain or upon a suspect's passive acquiescence is whether "in view of all of the circumstances…, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980). And the Court added to this test that when a person "'has no desire to leave' for reasons

No. 20-60056

unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Brendlin v. California*, 551 U.S. 249, 255, 127 S. Ct. 2400, 2405–06 (2007) (citing *Bostick*, 501 U.S. at 435–36, 111 S. Ct. at 2387).

The parties debate the existence of a "seizure" under the circumstances present here, and there appears to be no Fifth Circuit case where a law enforcement seizure occurred by the mere surrounding presence of police cars and Officer Stanton's non-threatening approach to Mayo's auto. We need not resolve that debate and will assume arguendo that the police cars' surrounding of the Cadillac, under the totality of circumstances, "seized" Flowers and Mayo. The district court principally viewed this incident as analogous to a stop-and-frisk situation, for which the court found reasonable suspicion under *Terry*. This conclusion, based on credibility determinations to which we are bound to defer, was sufficient to vindicate the officers' actions.

The following facts are determinative. The police were patrolling on Capitol and Remembrance, the exact streets where this arrest occurred, because of the prevalence of "violent crime and burglaries." The Supreme Court has noted, "the fact that [a] stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000) (citing *Adams v. Williams*, 407 U.S. 143, 147–48, 92 S. Ct. 1921, 1924 (1972). In addition, Officer Stanton was no novice. He possessed an undergraduate degree in justice administration and a masters degree in criminology and had ten years of law enforcement experience. In determining reasonable suspicion, courts must consider the facts in light of the officer's experience. *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883.

6

No. 20-60056

The officer saw a car parked in the convenience store lot as far as possible from the storefront, facing its brick wall rather than the glass door, so its occupants could not easily be viewed from within the store. Two males were in the car, and Officer Stanton observed that neither of them stepped out of the Cadillac heading toward the store for 10–15 seconds. The district court found the officer's testimony credible. Every case that turns on reasonable suspicion is intensely fact specific. *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) (per curiam) ("The reasonable suspicion analysis is a fact-intensive test . . . ."). The reasonable, articulable facts taken in context here supported an investigation at least to the point of the officer's dispelling the ambiguity in the situation.

In 1992, this court decided en banc that a police officer did *not* violate the Fourth Amendment when he "reached out and touched the pants pocket" of an individual who, appearing to be intoxicated, was standing in the road, at night, in a high crime area. *United States v. Rideau*, 969 F.2d 1572, 1573 (5th Cir. 1992) (en banc). As happened here, the individual was later convicted of illegally possessing a gun discovered during the frisk. We reiterated en banc the reasonableness of an officer's conduct during a stop-and-frisk two years later in *United States v. Michelletti*, 13 F.3d 838 (5th Cir. 1994) (en banc) (officer lightly frisked pants pocket in which a man held his right hand while barging out of the back door of a bar at closing time, holding an open beer in his left hand, as he approached a group of police and individuals they were about to question). *Michelletti* noted that in the seminal *Terry* case, when detained by the police, the suspects had actually turned and began walking away from the store they had possibly been casing for later burglary. Moreover, in support of its conclusion, the Supreme Court relied heavily on the police officer's seasoned judgment of what the occasion demanded. *Terry*, 392 U.S. at 22–23, 88 S. Ct. at 1880–81. Here, of course, we are not confronted with the additional physical invasion of a frisk, only the

No. 20-60056

officer's attempt to question Flowers and Mayo, which was cut short by the marijuana odor wafting from their car. Time has not overborne these considered holdings in our circuit.

Ignoring these authorities, Flowers and the dissent cite other cases. The case most heavily relied upon by Flowers is *United States v. Hill*, 752 F.3d 1029 (5th Cir. 2014), but that case is distinguishable. First, the court held that there was no seizure until the officer took the suspect out of his car and told him to turn around and place hands on his car. *Id.* at 1033. The officer's merely approaching the car and insisting that the suspect talk to him did not trigger a seizure. Second, *Hill* has nothing to say about the circumstances preceding the officer's commands, other than that the elevated incidence of crime considered there spanned an entire county, not a single neighborhood as in this case. *Id.* at 1034. Third, apart from concern about crime in the county, the only facts supporting the seizure in *Hill* were that the man and woman were sitting in a car and the woman hastily exited when they noticed the police. *Id.* Fourth, the car was parked in plain view in an apartment complex, a location where one would expect multiple cars to be parked, not in a suspicious spot as the only car in a convenience store lot. *Id.*

Nor is our holding contrary to *United States v. Beck*, 602 F.2d 726 (5th Cir. 1979), on which the dissent relies. In that case, the court held there was no reasonable suspicion for an afternoon seizure of two individuals seen parked in a car, where no crimes had been committed recently in the vicinity, and there was no reason to suspect the vehicle's occupants were engaging in improper conduct. In *Flowers,* however, the stop occurred at night in a neighborhood so unsavory it had a special task force assigned to patrol actively, and the defendants were parked suspiciously close to a convenience store in a manner that suggested to the seasoned officer that its occupants might be casing the store or preparing to prey on patrons.

No. 20-60056

*United States v. McKinney* is also not helpful to the dissent. *See* 980 F.3d 485 (5th Cir. 2020). In that case, there was no suppression hearing in the district court, and this court's review was therefore de novo. Further, the defendant McKinney had entered a conditional guilty plea, and when this court found the facts insufficient to sustain reasonable suspicion as a matter of law, we remanded for a hearing and potentially a trial. Although *McKinney* is somewhat similar, its procedural posture prevents using that case as precedent here.

In any event, *McKinney* correctly observed that the reasonable suspicion analysis "depends on the combination of facts," *id.* at 491, but the combination of facts in *Flowers* is different. In *McKinney,* the court described the crime in the area as several recent drive-by shootings, which is serious to be sure, but does not present the same pervasive and continuous criminal pattern described in the case before us. It also appears that the officers in *McKinney* voiced a questionable and overbroad approach to policing that did not suffice to articulate a reasonable basis for suspicion.[3] In this case, in a notoriously crime-ridden neighborhood, at night, two men were seen to be dawdling in a Cadillac parked out of view from inside the convenience store but also stationed where they could watch its entrance. Convenience stores are a type of establishment known to be frequent targets for theft, robbery, and burglary. Taken together, these facts present a similarly suspicious scenario to that which alerted the officer in *Terry*, and it captured the attention of the officer here. Finally, the non-threatening nature of Officer

---

[3] "Officer Carmona added: 'You want to know what my reasonable suspicion is? That there's been three or four shootings here in the last day and a half.' Later, Officer Holland warned the others in the group: '[If] [y]ou are hanging out over here, you are going to get stopped, you are going to get checked. Especially if you are gang members.'" *United States v. McKinney*, 980 F.3d 485, 489 (5th Cir. 2020).

Stanton's approach to the car's occupants is supported here by the lack of hostility on the part of Flowers and Mayo, and indeed a reaction that indicated Flowers was attempting to cooperate with the "field interview."

It bears repeating that apart from the presence of a number of police cars, the tenor of Officer Stanton's encounter with Flowers was entirely benign until Stanton smelled marijuana. He conducted no physical frisk of Flowers's person but simply approached the Cadillac to ask some questions. If this course of conduct is constitutionally impermissible, then it is difficult to see how any active policing can take place in communities endangered and impoverished by high crime rates.[4] Officers in such areas may well require safety in numbers, while the law-abiding citizens desperately need protection that will be denied if law enforcement officials believe that incriminating evidence will be suppressed or they will be sued for alleged violations of rights. *Terry* prescribes a careful balance that protects individual rights, but not at the expense of reasonable law enforcement activity and officer safety.

More recently commenting on these types of cases, the Supreme Court noted in *Illinois v. Wardlow*, "[e]ven in *Terry,* the conduct justifying the stop was ambiguous and susceptible of an innocent explanation." 528 U.S. at 125, 120 S. Ct. at 677 (2000). The Court rejected the proposition that because the suspect's flight from officers might have been innocent and "not necessarily indicative of ongoing criminal activity," the detention was constitutionally unreasonable. The Court reaffirmed that "officers c[an] detain [] individuals to resolve the ambiguity" in their conduct. Indeed, the Court emphasized that, in allowing such detentions, the Fourth Amendment

---

[4] The murder rate in Jackson, MS, has been among the highest in the nation, according to FBI statistics, in 2018, 2019 and 2020.

"accepts the risk that officers may stop innocent people." *Id.* at 126, 120 S. Ct. at 677.

In the case before us, there is no indication that the officers were either abusive or threatening. Once Flowers opened his window, Officer Stanton smelled a distinct odor of marijuana, and immediately afterward he saw Mayo apparently attempting to swallow something that could be evidence. At that point, it is undisputed that he had probable cause to seize Flowers by asking him to step out of the car, leading to the immediate discovery of his pistol.

*     *     *

Based on the foregoing discussion, we AFFIRM the conviction.

No. 20-60056

JENNIFER WALKER ELROD, *Circuit Judge*, concurring in part,[1] dissenting in part:

In *Terry v. Ohio*, the Supreme Court held that reasonable suspicion supported a stop where an officer, who suspected two men of casing a store, observed them walking back and forth in front of the store for ten to twelve *minutes*. 392 U.S. 1, 6 (1968). Here, the majority opinion finds reasonable suspicion after a police officer in Jackson, Mississippi observed two men sitting in a parked vehicle outside a convenience store for ten to fifteen *seconds*. How far we have come.

"Any analysis of reasonable suspicion is necessarily fact-specific . . ." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999). The key facts are undisputed in this case. Otha Ray Flowers and another man were sitting in a parked Cadillac in front of an open convenience store at 8:30 p.m. on a Saturday night. The majority opinion describes the car as being parked "as far as possible from the storefront," Maj. Op. at 7, but the exhibits submitted at the evidentiary hearing conflict with this characterization. Instead, the exhibits show that the men were parked in one of only five or six available spots in the small lot. The small parking lot offered few other parking options besides the spot Flowers chose.

Five to six officers were patrolling the area, each in a separate patrol car. They were not responding to any calls regarding suspicious behavior in the area or at the convenience store, and certainly not regarding the two men sitting in their car. After Officer Stanton turned onto Road of Remembrance, he observed the car and its occupants "for approximately 10 to 15 seconds,"

---

[1] I agree with the majority opinion that none of the prosecutor's statements at trial casts serious doubt on the correctness of the verdict. The statements did not prejudice Flowers's substantial rights.

the time period that the majority opinion refers to as "dawdling." Maj. Op. at 9. Officer Stanton did not observe the occupants make any suspicious movements within the car during those few seconds. He merely noticed that they had not exited the car during the time that the police caravan turned the corner.

Based solely on that observation, Officer Stanton and at least four other patrol cars activated their blue emergency lights and surrounded the Cadillac in which Flowers and his passenger sat, trapping them. The officers exited their patrol cars to approach the vehicle from both sides.

Although the majority does not reach the issue, there is no doubt that this encounter constituted a seizure. A person is seized when, under the totality of the circumstances, "a reasonable person would have believed that he was not free to leave." *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Here, the placement of the patrol cars blocked Flowers's exit from the parking lot. To leave, Flowers would have had to either collide with a patrol car to drive away or abandon his car and, on foot, weave through the patrol cars and approaching officers. Those options were simply not reasonable. Flowers was trapped.

The majority opinion states that "there appears to be no Fifth Circuit case where a law enforcement seizure occurred by the mere surrounding presence of police cars and Officer Stanton's non-threatening approach to Mayo's auto." Maj. Op. at 6. To the contrary, this circuit has held that a seizure occurred where officers—in only one vehicle rather than five or six— pulled alongside a defendant's vehicle in close proximity to it. *United States v. Beck*, 602 F.2d 726, 729 (5th Cir. 1979) ("By pulling so close to the Chevrolet, the officers effectively restrained the movement of Beck and his passenger; from the record it is readily apparent that they were not [']free to

ignore the officer(s) and proceed on (their) way.[']" (internal citation omitted) (first citing *United States v. Robinson*, 535 F.2d 881, 883 n.2 (5th Cir. 1976); then quoting *United States v. Elmore*, 595 F.2d 1036, 1041 (5th Cir. 1979))). Under our precedent, Flowers was seized at the outset of this encounter, before he rolled down his window, when officers surrounded his vehicle with their vehicles.

Other circuits have concluded similarly. For instance, in *United States v. Delaney*, 955 F.3d 1077, 1083 (D.C. Cir. 2020), the court held that a seizure had occurred where a single patrol car parked within a few feet of the defendant's vehicle in a narrow parking lot and *partially* blocked the defendant's egress, and police officers activated their take-down lights. In so holding, the court dismissed the government's argument that the defendant could have maneuvered his car around the police vehicle or simply walked away from the encounter. *Id.* at 1083–84; *see also United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) ("Given the fact that Williams blocked See's car with his marked patrol car, a reasonable person in See's position would not have felt free to leave."); *United States v. Pavelski*, 789 F.2d 485, 488 (7th Cir. 1986) ("A reasonable person . . . bounded on three sides by police patrol cars, would not have believed that he was free to leave.").

This case turns on whether, at that moment of seizure, the officers had reasonable suspicion of the men in the vehicle sufficient to justify the stop. It is the Government's burden to prove "specific and articulable facts that support the reasonableness of the suspicion." *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). We consider the "totality of the circumstances" to determine whether the officer's suspicion was reasonable. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Looking at the totality of the circumstances, there was no reasonable suspicion in this case, and the stop therefore violated Flowers's Fourth Amendment rights.  Two men were sitting in a parked car outside an open convenience store during the early evening for a mere ten seconds.  That is not suspicious behavior, nor does it transform into suspicious behavior because the convenience store was located in a high-crime area.  While the majority opinion notes that "[c]onvenience stores are a type of establishment known to be frequent targets for theft, robbery, and burglary," Maj. Op. at 9, a convenience store is also a place to get soft drinks, batteries, gum, and last-minute Valentine's Day gifts.  Parking in one of only a few available parking spots in front of a convenience store at an unextraordinary time of evening—8:30 p.m.—is something that any law-abiding citizen might do in order to patronize the store.  As for the "dawdling" of approximately ten to seconds, the men could have been finishing a conversation, responding to text messages, watching with curiosity as a six-car police caravan passed, or engaging in other reasonable behavior that explains the delay.  The facts in this case simply do not support an officer's reasonable suspicion.

Our court has held that reasonable suspicion was lacking in remarkably similar circumstances.  In *Beck*, we held that there was nothing "inherently suspicious" about two men sitting in a parked car *in a high crime neighborhood* on a midsummer afternoon a short distance from a convenience store.  602 F.2d at 729.  As we noted in *Beck*, "[h]ad [the officer] observed the vehicle for some time and seen Beck or his passenger take some suspicious actions, a stop might have been permissible, but under the facts here . . . the stop was illegal." *Id.*

Likewise, in *United States v. Hill*, we held that officers did *not* have reasonable suspicion sufficient to justify a stop after observing a man and woman sitting in a car parked in a high-crime area.  752 F.3d at 1035–36.  In that case, a man and woman were sitting in their parked car at an apartment

No. 20-60056

complex that had a reputation for drug-dealing.  It was much later at night, 11:00 p.m. on a Saturday night.  *Id.* at 1034, 1036.  When the police arrived, the female passenger exited the car hastily.  *Id.* at 1035.  Based on these circumstances, the police officer thought a drug transaction may have occurred in the car and seized the defendant.  *Id.*  Still, we held there was no reasonable suspicion.

The majority opinion deems it significant that in *Hill*, the court pointed to the moment Hill was asked to step out of his car and put his hands on the top of his car as the moment of seizure.  Maj. Op. at 8.  Of course, in *Hill*, the officers did not surround and block Hill's car with lights flashing preventing his egress entirely.  *Hill*, 752 F.3d at 1034.  Rather, they parked several parking spaces away, parallel to the car on the passenger side, and then approached.  *Id.*  Thus, the circumstances of Hill's seizure were different than Flowers's seizure.  But the analysis in *Hill* that there was no reasonable suspicion under these circumstances should guide us in this case.

Most recently,  in *United States v. McKinney*, we held that there was no reasonable suspicion for a seizure where officers observed the defendant standing on a sidewalk with three other people near a gas station which was in a high-crime area and in recent days had been the location of multiple gang-related drive-by shootings.  980 F.3d 485, 490 (5th Cir. 2020).  In that case, the defendant was wearing a jacket on a hot, humid night and red shorts (the color red was associated with a neighborhood gang).  *Id.*  Moreover, a woman in the group with the defendant slowly walked away when officers arrived.  *Id.*  Still, we held that this behavior did not suffice to raise an officer's reasonable suspicion.[2]  *Id.* at 497.

---

[2] Other circuits have similarly held.  *See United States v. Delaney*, 955 F.3d 1077, 1086–87 (D.C. Cir. 2020) (no reasonable suspicion when, shortly after hearing gunshots in a high-crime area, the officers came across a man and a woman sitting in a parked car);

No. 20-60056

Together these cases follow the principle from the Supreme Court that the fact that individuals are present in an area with a high crime rate, standing alone, "is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

As of yet, our court has not held that living in a high crime area renders all actions suspicious. The circumstances in both *United States v. Rideau*, 969 F.2d 1572 (5th Cir. 1992) (*en banc*) and *United States v. Michelletti*, 13 F.3d 838 (5th Cir. 1994) (*en banc*), cited by the majority opinion, involve such different circumstances that they are not relevant to determining whether reasonable suspicion is present in this case.

In *Rideau*, police were driving at night in a high crime area and encountered a man wearing dark clothing standing in middle of the road. 969 F.2d at 1573. Upon pulling over and approaching the man, he seemed nervous and evasive. *Id.* Only at that point did one of the officers reach out to pat the man's outer clothing to see if he had any weapons that could harm him or his partner. *Id.* In *Michelletti*, police officers were patrolling a high crime area around 2:00 a.m. 13 F.3d at 839. They observed the defendant drinking beer as he was leaving bar, a possible alcoholic beverage offense, and saw him approach a group of individuals the officers had previously determined were acting suspiciously outside the bar. *Id.* at 839–40.

---

*United States v. Jones*, 606 F.3d 964, 966 (8th Cir. 2010) (no reasonable suspicion for seizure when officers observed a man clutching the front of his hooded sweatshirt on a warm, sunny day in a high-crime area while watching the police cruiser as if concerned the officers would stop him); *Fam. Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 604 (6th Cir. 2015) (no reasonable suspicion when officers observed a pedestrian walk on the side of the road late at night in high-crime area, initially refuse to provide the police officer with his identity, and then walk away).

Moreover, the defendant had his right hand in his pocket at all times, making the officers suspect that he might have a gun. *Id.* at 842.

Neither of these cases involves conduct similar to the innocuous behavior observed in this case. *Rideau* and *Michelletti* are relevant only because the concerns voiced by the dissents in those cases—namely, that we must ensure that Americans living in disadvantaged or high-crime communities still have Fourth Amendment protections—are squarely present in this case.

Here, as in *Hill* and *Beck*, the Government did not point to any additional facts sufficient to convert an ordinary scene of two people sitting in a car into one that would support an officer's reasonable suspicion of criminal activity. It was not a suspicious time of day—merely 8:30 p.m. on a Saturday. The officers were not responding to any reports of suspicious behavior in the area, at the convenience store, or regarding the two men sitting in their vehicle. There was no testimony that police officers were looking for Flowers and his passenger or someone whose description they matched. Officers did not observe any suspicious movements in the vehicle as they turned the corner—the two men just sat there.

I would follow our precedent and hold that the officers did not have reasonable suspicion sufficient to justify the stop and that they violated Flowers's Fourth Amendment rights. For citizens to become suspects, they must do more than merely exist in an "unsavory" neighborhood. Maj. Op. at 8. As my able colleague once put it, "it defies reason to base a justification for a search upon actions that any similarly-situated person would have taken." *Rideau*, 969 F.2d at 1581 (Smith, J., dissenting). Otherwise, our law "comes dangerously close to declaring that persons in 'bad parts of town' enjoy second-class status in regard to the Fourth Amendment." *Id.* at 1577. I respectfully dissent.