# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 18, 2023

Lyle W. Cayce
Clerk

No. 21-40849

United States of America,

*Plaintiff—Appellee*,

*versus*

Jacob Boone Wright,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:20-CR-1444-1

Before Smith, Barksdale, and Haynes, *Circuit Judges*.

Rhesa Hawkins Barksdale, *Circuit Judge*:

At issue is whether Jacob Boone Wright was seized in violation of the Fourth Amendment when an officer, with emergency lights engaged, pulled behind Wright's parked vehicle, and he did not attempt to flee or terminate the encounter, but failed to comply fully with the officer's commands. Because the officer's actions communicated clearly to Wright he was not free to leave, and because he submitted to the officer's show of authority, we hold a Fourth Amendment seizure occurred at the time the officer activated her

No. 21-40849

emergency lights and almost simultaneously ordered him to stay in his car, which he continued exiting but stood beside.

The district court at the end of an evidentiary hearing, however, denied Wright's motion to suppress, concluding erroneously that the *Terry* stop was initiated instead at a later point in the encounter. As a result, its oral findings of fact and conclusions of law are inadequate for our reviewing whether reasonable suspicion existed at the earlier time we hold his seizure occurred.

Therefore, while retaining jurisdiction over this appeal, we remand to district court for it, based on the record developed at the suppression hearing, to prepare expeditiously written findings of fact and conclusions of law on whether the seizure at the earlier point in time was in violation of the Fourth Amendment. The district court is to then return this case to this court for further proceedings. REMANDED on LIMITED BASIS; JURISDICTION RETAINED.

I.

A.

The suppression hearing was held on 24 June 2021. The following recitation of facts is, unless otherwise noted, based on the record developed at that hearing.

The Corpus Christi, Texas, Police Department (CCPD) on 15 July 2020 (at "about 4:30 in the afternoon", as used in the Government's question to the caller discussed *infra*) received an anonymous "suspicious vehicle call" regarding a vehicle in the Glen Arbor Park area near Tanglewood Drive and Bonner Drive in Corpus Christi. Glen Arbor Park

and the surrounding neighborhood are part of a corridor of problem areas where drugs are sold. Officers respond to a few calls in this area every shift.

As a result of the call to CCPD, Officer Jakobsohn at 4:34 p.m. that day received an incident "call-out". The Officer testified the dispatcher (dispatch) told her "there was a suspicious vehicle in the area of the Glen Arbor Park near Tanglewood [Drive] and Bonner [Drive]", and directed her to respond. Dispatch also transmitted information regarding the call to the Officer's in-vehicle computer (call summary or call-log report generated by CCPD dispatch). In addition to providing the address for Glen Arbor Park and the names of the surrounding intersecting streets signifying the vehicle's location, the information communicated to the Officer included the following:

- SUSPICIOUS PEOPLE AT LOC/ RP ADV DRUG DEAL-ERS/NO DRIVING CARS AT LOC
- RP ADV NO DESC
- RP ADV PD NEEDS TO GET THESE DRUG DEALERS OUT OF HIS PARK
- DID THREATEN TO SHOOT SUBJS IF THEY DID SOMETHING THAT REQUIRED HIM TO DEFEND HIMSELF
- REF TO GIVE INFO ON HIMSELF
- ALSO ADV OF A GOLD COROLLA AT LOC/ IS ONE OF THE SUBJS CARS

This call summary was introduced in evidence by Wright at the suppression hearing, with Officer Jakobsohn's testifying about the summary. She explained it stated "suspicious people at the location, via drug dealers, driving cars at location". She further confirmed the information specified police "need[ed] to get these drug dealers out of [the caller's] park", but that the caller "did not advise a description". She did not testify about the

No. 21-40849

caller's threats; but, based on the caller's testimony, he threatened to shoot the subjects if they did something that required him to defend himself.

The Officer presented conflicting testimony about "REF TO GIVE INFO ON HIMSELF". Despite testifying she received the summary written in "all caps", she explained she did not "see any kind of refusal" by the caller to provide information; rather, the summary just stated the referring party (caller) did not want contact, nor did he provide information about himself. Finally, the Officer affirmed the caller provided information that a gold Toyota Corolla was one of the subjects' vehicles.

Minutes later, the Officer located a gold Toyota Corolla parked on Bonner Drive, across the street from the park; executed a three-point-turn; and pulled behind the vehicle, engaging her patrol vehicle's red and blue emergency lights. As the Officer parked her vehicle, she saw the driver's door open on the Corolla, and as she exited her vehicle, she commanded the driver—later identified as Wright—three times to "stay in [his] car".

Wright did not, however, remain in or re-enter his vehicle; but when the Officer told him to put his hands on his vehicle, he placed his keys on top of, and turned towards, it. The Officer then conducted a pat-down of Wright and attempted to move him next to her patrol vehicle, but he refused. He turned towards the Officer, keys in hand, and stated he wanted to talk to her.

When the Officer again commanded Wright to walk towards the patrol vehicle, he instead began removing a key from the key chain. Wright then disregarded the Officer's commands to put his keys on top of his vehicle. Once Wright separated one key and put the rest of them in his pocket, he turned and began moving towards the driver's door; the Officer moved him to the front of his vehicle and ordered him to put his hands behind his back.

Wright began knocking, and then banging, on his vehicle's hood, while yelling repeatedly to the passenger in the vehicle to exit and lock it. Wright

No. 21-40849

was also motioning to the passenger to put something in his mouth. The Officer handcuffed Wright; she testified that, at this point, she was arresting him for "resisting detention".

The passenger exited the vehicle as a second officer arrived. (According to testimony by a special ATF agent at Wright's subsequent 23 December 2020 preliminary hearing, the passenger was not arrested during the stop in question.) A search of the vehicle produced a pistol and drugs.

B.

Wright on 22 December 2020 was indicted for possession of firearm by a felon, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). After learning details of the anonymous tip, Wright on 17 May 2021 moved to suppress the firearm as evidence derived from an investigatory stop and seizure effected without reasonable suspicion, in violation of the Fourth Amendment.

In its response opposing the motion, the Government asserted: "based on the totality of the circumstances, including the information in the tip, the observance of activity consistent with that information, the defendant's nervous reaction to the police, his unusual behavior, and his attempt to walk away, reasonable suspicion existed to justify a *Terry* stop". *See Terry v. Ohio*, 392 U.S. 1 (1968) (discussed *infra*).

The 24 June 2021 suppression hearing, which lasted approximately 90 minutes, was held approximately 11 months after the 15 July 2020 incident. In addition to a map of the area and the Officer's dashboard and body-cam videos, the Government presented two witnesses: Officer Jakobsohn; and the anonymous caller, whom officers had identified only the week prior through knocking on doors in the area. Wright presented only the call summary.

At the conclusion of the hearing, the court ruled from the bench. It denied the motion to suppress, based on concluding it did not "think that

No. 21-40849

*Terry* was implicated [when the Officer pulled up behind the vehicle]"; rather, the court "[thought] *Terry* was implicated afterwards based on the conduct which was further . . . spoken to by the officer [at the hearing]", including the "chain of events that happened afterwards".  In that regard, the court concluded:  Wright's "taking the keys off the chain, not being willing to go back to the police officer's car, [and] his communication with the passenger, . . . allowed [the Officer] to initiate the *Terry* stop".  (Because a "*Terry* stop" is a seizure within the meaning of the Fourth Amendment, the term "stop" and "seizure" are used interchangeably in this opinion. *E.g.*, *United States v. Sharpe*, 470 U.S. 674, 682 (1985)).  (The point in time the court concluded the *Terry* stop permissibly occurred was, of course, subsequent to the time the Officer engaged her emergency lights and almost simultaneously ordered Wright to remain in his vehicle, which he instead stood beside.)

Following the 24 June denial of his suppression motion, Wright on 4 August 2021, a little over a year after the incident, pleaded guilty pursuant to a Federal Rule of Criminal Procedure 11(a)(2) conditional guilty plea, reserving the right to appeal the suppression ruling.  Our court granted Wright's motion to expedite his appeal.

II.

When, as here, defendant shows he was seized absent a warrant, the Government bears the burden in showing reasonable suspicion existed justifying the seizure. *E.g.*, *United States v. Martinez*, 486 F.3d 855, 859–60 (5th Cir. 2007).  Factual findings for the denial of a suppression motion are reviewed for clear error; conclusions of law, *de novo*.  *United States v. Smith*, 952 F.3d 642, 646 (5th Cir. 2020); *see also United States v. Rodriguez*, 564 F.3d 735, 740 (5th Cir. 2009) ("The district court's overall [ruling] that

6

No. 21-40849

reasonable suspicion existed for the stop is a conclusion of law that we review *de novo*.").

Viewing the evidence in the requisite light most favorable to the prevailing party (here, the Government), a district court's ruling will be upheld "if there is any reasonable view of the evidence to support it". *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014) (citation omitted).  In that regard, "[o]ne of the most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of the witnesses". *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation omitted). Therefore, when, as in this instance, live testimony forms part of the basis for denial of a suppression motion, our clearly-erroneous standard is "particularly strong" because the "judge had the opportunity to observe the demeanor of the witnesses". *Id.* (citation omitted).

On the other hand, video recordings are given a presumption of reliability and significant evidentiary weight because "[a]n electronic recording will many times produce a more reliable rendition . . . than will the unaided memory of a police agent". *United States v. White*, 401 U.S. 745, 753 (1971).  Accordingly, where testimony conflicts with video evidence, our court must view the "facts in the light depicted by the videotape". *Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *see also United States v. Vickers*, 442 F. App'x 79, 86, 87 & n.7 (5th Cir. 2011).

A.

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. Const. amend. IV; *Terry*, 392 U.S. at 9.  A "*Terry* stop" is a "special category of Fourth Amendment 'seizures'", in which an officer may briefly detain an individual for further investigation, if the officer has

7

reasonable suspicion the individual is engaged in criminal activity. *Terry*, 392 U.S. at 9; *Dunaway v. New York*, 442 U.S. 200, 210 (1979).

"A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). The seizure must be "justified at its inception"; therefore, "our first task is ordinarily to determine when the seizure occurred". *United States v. Flowers*, 6 F.4th 651, 655 (5th Cir. 2021) (citation omitted).

A seizure occurs when an officer "*objectively* manifests an intent to restrain" the liberty of an individual through either use of physical force or a show of authority. *Torres v. Madrid*, 141 S. Ct. 989 (2021) (emphasis in original); *Terry*, 392 U.S. at 19 n.16. "In the absence of physical force to restrain a suspect, '[a] police officer may make a seizure by a show of authority . . . , but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned.'" *Carroll v. Ellington*, 800 F.3d 154, 170 (5th Cir. 2015) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)). Accordingly, when, as presented in this appeal, a claimed seizure lacks physical force, we must analyze the encounter in two steps: whether the officer exerted a sufficient show of authority; and whether defendant submitted to it. *E.g.*, *id.*

1.

In determining whether an officer makes a sufficient show of authority, the court considers whether, in the light of "all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave". *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). When a person "has no desire to leave for reasons unrelated

No. 21-40849

to the police presence, the coercive effect of the encounter can be measured better by asking whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter". *Flowers*, 6 F.4th at 655 (citation omitted).

Wright contends the *Terry* stop was initiated when Officer Jakobsohn pulled up behind his vehicle. At the suppression hearing, the Government maintained the stop occurred when the Officer made physical contact almost immediately with Wright through the pat-down. In our court, however, the Government now predominantly asserts a position qualifying that the *Terry* stop may have occurred at some point earlier than the pat-down: when the Officer arrived with emergency lights engaged, or when she ordered Wright to remain in his vehicle.

A Federal Rule of Appellate Procedure 28(j) letter concerning *United States v. Morris*, 40 F.4th 323, 327 (5th Cir. 2022) (holding stop occurred when officers "flagged down" defendant's vehicle) was filed 3 November 2022 by Wright, four days before oral argument in our court; the Government responded three days before argument. The Government's response added to its position: "All agree that stopping one's vehicle pursuant to a police command of a visual signal constitutes a seizure"; but, because Wright's vehicle was already stopped, he was not seized when the Officer pulled behind him.

Although our case law is sparse in considering whether emergency lights constitute a seizure, our court in *Morris* (again, the subject of the 28(j) letter) recently explained "[a]n officer's visual signal for a motorist to stop—whether made by hand or lights and sirens—is such a show of authority". *Id.* at 327–28. The use of emergency lights will not always exhibit a show of authority, of course. For example, depending on the fact-specific

circumstances, emergency lights may be used instead by an officer to render aid or assistance.

In *Morris*, defendant parked his vehicle behind a truck-stop casino and went to sleep; officers on foot later noticed the vehicle, but when they walked towards it, it began to drive away. *Id.* at 325. After flagging down the vehicle, it came to a stop. *Id.* *Morris* held defendant was stopped under the Fourth Amendment when officers "flagged down" his vehicle even though they did not physically block it. *Id.* at 327. Our court concluded the district court focused incorrectly on whether officers blocked defendant's path, instead of assessing correctly whether the officers' actions constituted a show of authority, obligating defendant to submit. *Id.*

According to Wright's counsel at the suppression hearing, the sound on the dashboard-camera video began when the Officer's emergency lights were engaged; and the Officer turned her emergency lights on "maybe right before she stopped or right at the stop". In any event, although Wright's vehicle was already in the parked position, the use of emergency lights when Officer Jakobsohn arrived at his vehicle was a visual signal exhibiting her authority, as explained in *Morris*. *Id*; *see also Malina v. Gonzalez*, 994 F.2d 1121, 1126 (5th Cir. 1993) (holding stopping individual "on the interstate by flashing a red light, . . . is a show of authority").

The principle underlying our court's decision in *Morris* is not limited to actively moving vehicles. Accordingly, when the Officer quickly pulled up behind Wright's vehicle, with emergency lights engaged, she was showing a sign of authority clearly communicating to Wright he was not free to leave. That Wright's vehicle was parked at the time does not detract from the Officer's show of authority. Moreover, the Officer almost simultaneously ordered Wright to remain in his vehicle; and "[u]nder the Fourth Amendment's free to leave test, it is hard to conclude that a person ordered

No. 21-40849

to a certain location by police would feel free to leave". *Morris*, 40 F.4th at 328. (Therefore, on the facts presented by this case, it is not necessary to decide whether solely engaging the emergency lights constituted a seizure.)

2.

Officer Jakobsohn's having asserted authority over Wright by engaging her emergency lights and visually and orally communicating to him that he was not free to leave, we next consider whether Wright submitted to that authority. Determining the time at which an individual submits to authority "depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away". *Brendlin*, 551 U.S. at 262.

It is undisputed that compliance with an officer's commands constitutes submission to authority. *E.g.*, *United States v. Darrell*, 945 F.3d 929, 933 (5th Cir. 2019) (seizure occurred when defendant complied with officer's second command to stop). The question at hand, however, turns on whether Wright submitted when, although he disregarded the Officer's commands to remain in his vehicle, he did not attempt to flee or terminate the encounter.

At the suppression hearing, Officer Jakobsohn testified: she found it unusual to see the driver's door opening; and Wright's exiting the vehicle was "kind of an aggressive approach". The Officer's dashboard-camera video shows Wright slowly exiting his vehicle. He turns to face the Officer with his arms extended at mid-chest level, with the palms of both of his hands facing her, and calmly states "Ma'am, I haven't done anything". He did not lunge towards the Officer, nor did he make any threatening or evasive movements. Wright did not attempt to flee, nor terminate the encounter. *Contra California v. Hodari D.*, 499 U.S. 621, 628 (1991) (Seizure could not

11

No. 21-40849

"have occurred during the course of" a police chase because "that 'show of authority' did not produce [the individual's] stop". (citation omitted)).

Wright's not complying fully with some of Officer Jackobsohn's commands was improper, to say the least, but his behavior does not show defiance to the Officer's authority. Wright sufficiently submitted to the show of authority because he objectively appeared to believe he was not free to leave, and he did not attempt to flee, nor terminate the encounter.

B.

Wright's having been seized when Officer Jakobsohn pulled behind his parked vehicle with the emergency lights engaged on her patrol vehicle and almost simultaneously ordered him to remain in his vehicle, which he instead stood beside, we turn to whether the requisite reasonable suspicion existed to justify the seizure at that point.

1.

An officer has reasonable suspicion if, based on the totality of the circumstances at the time of the stop, she has a "particularized and objective basis for suspecting the particular person stopped of criminal activity". *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). The facts giving rise to reasonable suspicion must be "judged against an objective standard". *Terry*, 392 U.S. at 21. "The reasonable suspicion analysis is a fact-intensive test in which the court looks at all circumstances to weigh not the individual layers, but the laminated total." *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001).

In claiming the stop was initiated pursuant to an unreliable anonymous tip, Wright maintains Officer Jakobsohn lacked reasonable suspicion to justify the stop. The Government, on the other hand, again presents an ever-shifting position.

No. 21-40849

In district court, as quoted *supra*, the Government asserted in its response in opposition to suppression: "the totality of the circumstances, including the information in the tip, the observance of activity consistent with that information, the defendant's nervous reaction to the police, his unusual behavior, and his attempt to walk away" created reasonable suspicion justifying the stop.

At the suppression hearing, the district judge had the Government clarify its position:

> [The Government]: . . . So, here, it is our position that this case does not hinge on the tip that was provided by the 9-1-1 caller to the dispatch center but, instead, hinges on what happened when the officer arrived on the scene and the Defendant got out of his vehicle *and those events that occurred thereafter*.
>
> . . .
>
> The Court: When is it the Government's assertion that *Terry* was implicated, at what point?
>
> [The Government]: Well, she does the [pat-down]; and he is still playing with his keys; and *that was what started this—the trail of events that led to her reasonable suspicion ultimately*.
>
> The Court: Okay. So, it wasn't when she pulled up behind the car, it wasn't when he exited the car, it was when she actually made physical contact with the Defendant is the Government's position?
>
> [The Government]: Yes, your Honor.

(Emphasis added.)

At no point in the suppression hearing did the Government claim that the anonymous tip alone justified the seizure; instead, it repeatedly asserted the events that occurred after the pat-down cumulatively created reasonable suspicion. But, under its theory before this court, the Government contends

No. 21-40849

the anonymous tip regarding activity in a high-crime area established reasonable suspicion to justify the stop; in the alternative, the tip regarding activity in a high-crime area, plus Wright's exiting his vehicle, gave rise to reasonable suspicion.

"An investigative vehicle stop is permissible under *Terry* only when the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Martinez*, 486 F.3d at 861 (quoting *United States v. Jaquez*, 427 F.3d, 340–41 (5th Cir. 2005)). Reasonable suspicion "is dependent upon both the content of the information possessed by police and its degree of reliability". *Alabama v. White*, 496 U.S. 325, 330 (1990).

This is especially true when claimed reasonable suspicion is primarily grounded in information from a tipster. It goes without saying that not all tips to police warrant the same reliance. "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citations omitted). There are certain circumstances, however, where an anonymous tip is "suitably corroborated", exhibiting "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop". *Id.* (citation omitted).

Although a tip need not necessarily contain predictive information to establish reasonable suspicion, certain factors may be considered in deciding whether the tip provided a sufficient basis. *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010). Those factors are:

> (1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be

verified by officers in the field; and (4) whether the tip or report concerns active or recent activity or has instead gone stale.

*Id.* (citing *Martinez*, 486 F.3d at 861).

An anonymous tip may be found reliable when "the informant (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing and voice recording". *United States v. Rose*, 48 F.4th 297, 303 (5th Cir. 2022) (citing *Navarette v. California*, 572 U.S. 393, 398–401 (2014)). (Although the Government claimed the call was through the 9-1-1 system, it had stated earlier for purposes of the indictment that the call was a suspicious-vehicle call. In any event, as discussed *supra*, even assuming it was a 9-1-1 call, the Government did not produce the recording or the dispatcher at the suppression hearing. As noted, the caller was found instead by knocking on doors the week prior to the hearing. And, as discussed *supra*, Officer Jakobsohn testified at the suppression hearing it was a suspicious-vehicle call.)

2.

As stated, and contrary to the district court, we hold Wright was seized when the Officer pulled behind his parked vehicle with the emergency lights engaged on her patrol vehicle and almost simultaneously ordered him to remain in his vehicle. That the *Terry* stop was initiated earlier than when the district court concluded obviously "changes the analysis". *Morris*, 40 F.4th at 329.

All agree, as the district court noted at the hearing on the suppression motion, that the Government bears the burden of proving reasonable suspicion existed to justify the seizure. *E.g.*, *Martinez*, 486 F.3d at 859. At the hearing, the Government, as discussed *supra*, did not base its position on

the anonymous tip; instead, it emphasized that the "trail of events [occurring after the pat-down] led to [the Officer's] reasonable suspicion ultimately".

After hearing testimony from two witnesses, reviewing evidence, and hearing argument from the parties, the court made its findings of facts and conclusions of law from the bench. Prefacing its findings, the court stated: it was "not really sure that [the testifying] anonymous caller helped [the Government] out very much"; and, in ruling on the motion, it was "basing it on the totality of the circumstances *articulated by the officer* in this particular case". (Emphasis added.) The court then made its findings of fact and conclusions of law:

> What I have before me is what [the Officer] saw on her screen which was report of suspicious people at a location, drug dealers. There's an identification of a gold Corolla. And so, based on that and her experience that this was an area that had a high crime rate, vagrancy, and drug dealing, I find that it is reasonable for her to, at least, have pulled up behind the car. *I don't think that Terry was implicated at that point*; and then, of course, all of the behavior that happened afterwards.
>
> . . .
>
> So, based on the identifying information of the gold Corolla, I find that it was absolutely reasonable for her to have pulled behind a gold Corolla to, at least, investigate; and I think that *Terry was implicated afterwards* based on the conduct which was further, I think, spoken to by the officer.
>
> . . .
>
> And then, the chain of events that happened afterwards with the conduct that we saw on the video. So, taking the keys off the chain, not being willing to go back to the police officer's car, his communication with the passenger, all of those things I

No. 21-40849

think allowed her to initiate the *Terry* stop; and then, the resisting is what happened afterwards with his conduct.

(Emphasis added.)

As reflected above, and consistent with, provided above, the court's not relying on the tipster's testimony in making its findings and conclusions, the court's findings and conclusions are silent on the reliability of the anonymous tip and whether reasonable suspicion existed when, as held by this court, Wright was seized, as discussed *supra*. The court's finding it was "reasonable" for the Officer to pull behind Wright's vehicle cannot be read synonymously with a conclusion that she possessed "reasonable suspicion supported by articulable facts that criminal activity may be afoot". *Martinez*, 486 F.3d at 861 (citation omitted).

"The Supreme Court has made clear that the initial reasonable suspicion determination should be made by the 'resident judge,' that is, the trial court of first instance, and the courts of appeal must give 'due weight' to that court's 'factual inferences'." *Morris*, 40 F.4th at 329 (quoting *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002)). Accordingly, "it is not the place of our court to decide in the first instance the key issue of whether there was reasonable suspicion for the [Officer's] stop". *Id.*

Based on the district court's concluding the *Terry* stop was initiated later than our holding *supra* it occurred when the Officer pulled behind Wright's parked vehicle with the emergency lights engaged on her patrol vehicle and almost simultaneously ordered him to remain in his vehicle, the record lacks adequate findings of fact and conclusions of law for whether reasonable suspicion existed at that point. In other words, because the court's findings and conclusions turn instead on events occurring after the *Terry* stop, we are unable to deduce from them whether the court concluded

the totality of the circumstances prior to the Officer's pulling behind Wright's vehicle provided reasonable suspicion justifying the stop.

Accordingly, we remand for the limited purpose of the district court's expeditiously providing written findings of fact and conclusions of law on whether reasonable suspicion existed when the Officer pulled behind Wright and ordered him to remain in his vehicle. Toward that end, because "the suppression hearing provided the [G]overnment the opportunity and obligation to present evidence establishing" reasonable suspicion, "[w]e will not afford the [G]overment a second opportunity to present evidence to the district court in attempt to meet their burden of proof". *United States v. Raney*, 633 F.3d 385, 392 (5th Cir. 2011). Instead, the findings and conclusions are to be based on the record developed at the suppression hearing.

### III.

For the foregoing reasons, we retain jurisdiction over this appeal and remand to district court on a limited basis. As directed by this opinion, the court is to prepare expeditiously, based on the record developed at the suppression hearing, the above-described written findings of fact and conclusions of law. The court is to then return this case to this court for further proceedings. REMANDED on LIMITED BASIS; JURISDICTION RETAINED.