# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 25, 2023

Lyle W. Cayce
Clerk

———————

No. 21-40849

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Jacob Boone Wright,

*Defendant—Appellant*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:20-CR-1444-1

———————————————————

Before Smith, Barksdale, and Haynes, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

This case returns to us after a limited remand. In the first submission, we clarified the point at which defendant Jacob Wright experienced a Fourth Amendment "seizure." *United States v. Wright* (*Wright I*), 57 F.4th 524, 533 (5th Cir. 2023). But we remanded for further factfinding about the circumstances precipitating the seizure. Now, based on the district court's new findings, we conclude that the police had reasonable suspicion to seize Wright and thus lawfully obtained the incriminating evidence from his car. We affirm the judgment of conviction.

No. 21-40849

I.

For the most part, the facts are as described in *Wright I*, *id.* at 527–29. We repeat only those details that are relevant to the reasonable-suspicion inquiry or were clarified on remand.

A.

On July 15, 2020, the Corpus Christi Police Department received a "suspicious vehicle call." The caller—who asked to remain anonymous—told dispatch that a gold Toyota Corolla was parked on Tanglewood Drive near Glen Arbor Park and that the occupants were dealing drugs.

A core factual dispute is whether the tipster made the bare accusation that the individuals in the car were "dealers" or whether he claimed to see them dealing drugs. The dispatcher's "call summary log" indicated that the tipster said that the occupants of the gold Corolla were "drug dealers," that they were in "his park," that the police needed to clear them out, and that he would shoot the suspects if necessary to defend himself.[1] Later, however, the police convinced the tipster to identify himself and testify at the suppression hearing. There, he gave slightly more detail—he claimed that he told police

_____

[1] Specifically, the log included the following information:

- SUSPICIOUS PEOPLE AT LOC/RP ADV DRUG DEALERS/NO DRIVING CARS AT LOC

- RP ADV NO DESC

- RP ADV PD NEEDS TO GET THESE DRUG DEALERS OUT OF HIS PARK

- DID THREATEN TO SHOOT SUBJS IF THEY DID SOMETHING THAT REQUIRED HIM TO DEFEND HIMSELF

- REF TO GIVE INFO ON HIMSELF

- ALSO ADV OF A GOLD COROLLA AT LOC/ IS ONE OF THE SUBJS CARS

dispatch "that there was a gold Toyota Corolla . . . at the pavilion doing a re-up, giving drugs to the transients that deal in that park."

Regardless of what precisely the tipster said on the phone, the truncated "call summary log" was sent to Officer Jakobsohn, who was already in the area. As soon as she received the bulletin, she headed toward Glen Arbor Park and arrived within a few minutes. There, she spotted a gold Corolla parked on Tanglewood Drive, just as the tipster had said. She executed a three-point turn and pulled up behind the vehicle with her red and blue flashers activated. Almost immediately, the driver (Wright) opened the driver's door and moved to exit the vehicle. Jakobsohn shouted "stay in your car!" She repeated the command two more times, but Wright ignored her and stepped out of his car.

Jakobsohn then got out of her police cruiser and confronted Wright. After a verbal altercation, she handcuffed Wright and arrested him for "resisting detention." She proceeded to search the car, which revealed a pistol and synthetic marihuana.

Wright was indicted on one count of being a felon in possession of a firearm. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2). He moved to suppress the evidence of the weapon, claiming that the gun was the fruit of an unlawful seizure because Jakobsohn lacked reasonable suspicion to initiate a "*Terry* stop."[2] The district court orally denied the motion to suppress after a live hearing, based on testimony from Jakobsohn and the tipster. Wright entered a conditional guilty plea, reserving the right to appeal the denial. After the court entered a judgment of conviction, Wright timely appealed.

---

[2] A *Terry* stop is a brief investigatory detention. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968).

No. 21-40849

B.

Before the remand, we had to decide when Wright was "seized" within the meaning of the Fourth Amendment. The district court was not precise in the suppression hearing about when exactly it thought Wright was seized, but it found that the Fourth Amendment was not implicated until after Wright and Jakobsohn got out of their cars and after their verbal altercation. We disagreed. We held that Wright was seized as soon as Jakobsohn pulled behind Wright with her lights flashing and "almost simultaneously" ordered him to remain in his car. *Wright I*, 57 F.4th at 533. That was the start of the *Terry* stop.

Still, a *Terry* stop must be justified by reasonable suspicion, and it was unclear whether Jakobsohn had reasonable suspicion at that point. Because the district court thought the *Terry* stop occurred later in the encounter, it did not specifically evaluate the circumstances supporting reasonable suspicion at the time Jakobsohn initially approached Wright. It also failed to make factual findings about the reliability of the anonymous tip. *See id.* at 535. Given those shortcomings in the record, we remanded for the district court to determine, in the first instance, whether Jakobsohn had reasonable suspicion to seize Wright at the moment she pulled up behind him and ordered him to stay put. *Id.* at 536.

C.

On remand, the district court helpfully clarified three critical facts. *First*, it specified that the anonymous tip came as a "suspicious vehicle report," not through the 911 system. *United States v. Wright*, No. 2:20-CR-01444, 2023 WL 1928221, at *2 (S.D. Tex. Feb. 9, 2023). Because it was not a 911 call, it appears there was no way to record the call or trace the caller. *See id.* at *6. *Second*, the court explicitly found the tipster's testimony at the suppression hearing credible. *Id.* at *8. And *third*, the court found that the

4

tip included both the information in the dispatcher's call summary log and the additional details furnished by the tipster at the suppression hearing. *See id.* at *1–2. Therefore, the court found that the tipster gave a contemporaneous and eyewitness account to dispatch that he had seen drugs dealt out of the gold Corolla. *Id.* at *5–6.

The district court also offered several new legal explanations to support its ruling. For one thing, it found that the anonymous tip could be reliable under the totality of the circumstances even if the call was not made through 911 and was not traceable. *Id.* at *6. It also noted that Jakobsohn knew that Glen Arbor Park was rife with drug crime, and that experience supported her reasonable suspicion. *Id.* at *7. Finally, the court relied on the so-called "collective knowledge doctrine" to conclude that the combination of the dispatcher's and Jakobsohn's knowledge could justify the *Terry* stop. *Id.* at *7–9. Based on that reasoning, the district court reaffirmed its original finding that Jakobsohn had reasonable suspicion. *Id.* at *9.

## II.

Now the case comes back to us. With the benefit of the district court's new factfinding and the parties' supplemental briefs, we can answer whether Jakobsohn had reasonable suspicion to initiate a *Terry* stop of Wright.

The answer is yes. Jakobsohn's *Terry* stop was lawful if, based on the totality of the circumstances, she had "a particularized and objective basis for suspecting" that Wright was engaged in criminal activity. *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981). And Jakobsohn seized Wright based on a reasonable suspicion that he was involved in drug dealing. Her belief was based on the combination of (A) the tip, (B) the high-crime area,

No. 21-40849

and (C) Wright's exiting the vehicle.[3]

### A.

Start with the tip. Reasonable suspicion can be based on anonymous tips. *Navarette v. California*, 572 U.S. 393, 397 (2014). The tip just needs to evince "sufficient indicia of reliability" that the officer can justifiably rely on it to make a stop. *Alabama v. White*, 496 U.S. 325, 327 (1990). Our circuit has used four factors to determine whether a tip is sufficiently reliable:

> (1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or report concerns active or recent activity or has instead gone stale.

*United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010).

But before we can say the tip was reliable, we must be clear about its contents. The district court found that the tipster told the dispatcher exactly what he said at the suppression hearing, that he was an eyewitness to drug dealing out of the gold Corolla. Wright disputes that. He says that the substance of the tip was limited to the information in the dispatcher's memo, as anything said in the suppression hearing was too far removed from the event to be reliable. Wright also suggests that the tipster's testimony did not clearly communicate that he was an eyewitness to the criminal activity.

But the district judge was the one who heard the tipster's testimony. It concluded that the tipster accurately testified to the content of the tip. More importantly, the court found that the tipster told dispatch that he had

---

[3] As always, we consider whether there was reasonable suspicion *de novo*, and we review the district court's factfinding for clear error. *See United States v. Ganzer*, 922 F.3d 579, 583 (5th Cir. 2019).

No. 21-40849

witnessed the drug dealing with his own eyes. *Wright*, 2023 WL 1928221, at *1, 5. That is a fair inference from the testimony. We will not disturb the district court's factfinding on appeal.[4]

In sum, the anonymous tip purported to be (a) eyewitness testimony (b) of recent or ongoing illegality (c) at a specific place (d) in a car of a specific make, model, and color. That proves reliable under each of the *Gomez* factors.

1.

In determining whether an anonymous tip can support reasonable suspicion, the first consideration is the reliability of the tipster. *Gomez*, 623 F.3d at 269. While that inquiry depends on the specific circumstances of each case, *Navarette* helpfully clarified that an anonymous tipster is sufficiently reliable where (1) the caller "necessarily claim[s] eyewitness knowledge" of illegal behavior, (2) the call is made "contemporaneous[ly] with the observation of criminal activity," and (3) the caller uses the 911 emergency system, making their claim traceable and risking criminal liability for a false tip. *Navarette*, 572 U.S. at 398–401.[5]

Two of the three *Navarette* factors are present. By stating that he saw drugs being dealt out of the gold Corolla, the tipster "necessarily claimed eyewitness knowledge" of illegal behavior. *See id.* at 399. Furthermore, the

---

[4] *See United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) ("Where a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." (quoting *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005))).

[5] *Navarette*'s three indicia of reliability fit most comfortably under the first *Gomez* factor—the credibility of the informant. *See United States v. Rose*, 48 F.4th 297, 303 (5th Cir. 2022) (per curiam) (citing *Navarette*, 572 U.S. at 398–401). That said, there is some overlap between the factors in *Navarette* and the other three *Gomez* factors.

call was made at the same time as the drug dealing that the tipster claimed to witness. *Wright*, 2023 WL 1928221, at *6.

Admittedly, the tipster did not use 911 to make his report, using a "suspicious vehicle" reporting line instead. Wright insists that, without the inherent traceability of a 911 call, a tip cannot be reliable under *Navarette*.

But *Navarette* did not establish an exhaustive set of necessary requirements for an anonymous tips. It only identified three factors that, considered in context, made a tip reliable. *See Navarette*, 572 U.S. at 404. Although *Navarette* did not clarify what would happen if one factor was not present, "the use of the 911 line was only one indicator of veracity" in that case; "[a] call . . . does not become unreliable solely because" it comes outside the 911 system. *United States v. Aviles-Vega*, 783 F.3d 69, 76–77 (1st Cir. 2015).

Indeed, "there is more than one way to demonstrate a particularized and objective basis" for a *Terry* stop. *Navarette*, 572 U.S. at 404 (quotation omitted). Although the tipster did not use 911, the call was not completely anonymous. The tipster strongly suggested that he lived near the park. Indeed, the police found the informant merely by knocking on doors near the spot where Wright was arrested. More persuasively, Jakobsohn testified that almost no "bogus" leads came through the suspicious vehicle reporting line, so she was inclined to believe the tip. Those facts support the tip's reliability, even in the absence of a 911 call.

Wright counters that the tip had some features of *un*reliability. In particular, he cites the tipster's suggestion that he would shoot any drug dealers with his AR-15 if he was forced to defend himself. But that statement can be interpreted multiple ways. Wright reads the statement as evidence the tipster was unhinged and untrustworthy. The government sees the statement as proof of his sincerity, as the tipster would not have made such an excited utterance unless he actually witnessed an emergency. Because the

No. 21-40849

tipster's threat had an uncertain effect on the tip's reliability—and given that two of the other *Navarette* factors were satisfied—we agree with the district court's conclusion that the police officers had reason to think that the tipster's testimony was credible.

2.

The credibility of the tipster, however, is not the only consideration. As mentioned, there are four factors from *Gomez*. A tip is more likely to support reasonable suspicion if it is specific, verified, and recent. *See Gomez*, 623 F.3d at 269; *see also United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007). This tip was all three of those things.

The information in the tip was short but specific. It gave the make, model, and color of the car. It gave the road where the car was parked and the cross streets. And it described the illegal activity that was seen—the car's occupants were giving drugs to "transients." The police were also able to verify most of the tip's contents within minutes; the only allegation Jakobsohn did not confirm with her own eyes was the supposed drug dealing. Yet that is why she initiated the investigatory stop in the first place—the whole point of a *Terry* stop is to allow officers to freeze the *status quo* and see whether there is any reason to be concerned. *See Adams v. Williams*, 407 U.S. 143, 146 (1972). And finally, the tip was contemporaneous with the event observed. We give much more weight to contemporaneous tips than to older reports about criminal activity. *See United States v. Alvarez*, 40 F.4th 339, 347 (5th Cir. 2022).

Admittedly, the Supreme Court suggested in *Florida v. J.L.*, 529 U.S. 266 (2000), that an investigatory stop based on an anonymous tip was inappropriate where police were only able to confirm innocuous visual details at the scene. There, the tipster told police that a young black male was at a particular bus stop, wearing plaid, and carrying a gun. *Id.* at 268. Police went

to the bus station and saw a black man in plaid, but the Court ultimately held that there was no reasonable suspicion to stop and frisk the defendant. Notably, the tipster did not explain *how* he knew about the gun, and the tip contained "no predictive information." *Id.* at 271. Even though it correctly identified the location and garb of the suspect, "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272.

In *Martinez*, a case similar to *J.L.*, we confronted a tipster who told police that "a man named 'Angel' might have been a witness to a quadruple homicide, might be in possession of the weapons used in the homicide, and might be planning to flee to Mexico with those weapons." *Martinez*, 486 F.3d at 858. The tip also suggested that Angel might be at a specific address in Pasadena. Police went to the house and, after an investigation, discovered Angel there. But we held that the combination of tip and confirmation could not furnish reasonable suspicion for a seizure. Relying on *J.L.*, we explained that even though "the police might corroborate a mountain of innocent data, such as a person's identification and whereabouts," it "does not provide any basis for executing a *Terry* stop on that person." *Id.* at 864.

Wright contends that this case is just like *J.L.* and *Martinez*—the tip lacked predictive information, and Jakobsohn confirmed only "innocent data" at the scene before making her *Terry* stop. But *J.L.* and *Martinez* involved tips about concealed crimes (carrying illegal weapons, specifically), that there would be no reason for a random tipster to know about. *Navarette* and this case both involve tips about open and obvious activity (reckless driving and public drug dealing) that a passerby could more likely witness and reliably report. Additionally, the tipsters in *J.L.* and *Martinez* gave no basis for their allegations of criminality. In other words, there was nothing in the tips themselves to distinguish knowledge from rank speculation. By contrast, *Navarette* dealt with a tipster who purported to be an eyewitness to an

ongoing crime. That is what we have here. And *Navarette* made clear that such a tipster does *not* need to provide predictive information to be reliable; nor do police need to corroborate visually the alleged illegality if there are other indicia that the tipster is reliable. *See* 572 U.S. at 398–404.[6]

Since *Navarette*, we have clarified that "there is no per se rule prohibiting investigatory stops based on anonymous tips that fail to provide predictive information." *United States v. Rose*, 48 F.4th 297, 304 (5th Cir. 2022) (per curiam). A non-predictive tip that is "highly specific" can still create reasonable suspicion where an eyewitness reports observed criminality and key elements of that tip are corroborated at the scene. *Id.* at 304.[7]

This case is closer to *Rose* than to *J.L.* The anonymous informant in *Rose* described events that were "unfolding . . . in real time," "described the make, model, and color of the car," noted the car's location, described the suspect in detail along with his illegal activities, and described details of a gun involved. *Id.* at 304. Indeed, in *Rose*, we expressly held that the tipster at issue was more reliable than the one in *J.L.* because he "explained exactly how he knew about the alleged criminal activity: he was an eyewitness to conduct occurring in plain view at a public place." *Id.* at 305. The court therefore held that "all the factors weigh in favor of the government" and the officers had reasonable suspicion to initiate a *Terry* stop based on the anonymous tip. *Id.* at 306.

---

[6] In fact, in *Navarette*, the police observed behavior that *contradicted* the tipster's testimony, but the Court still held that the officers were entitled to rely on the tip. *Compare* 572 U.S. at 403–04, *with id.* at 412–13 (Scalia, J., dissenting).

[7] Other courts shared that intuition even before *Navarette*. *See United States v. Wheat*, 278 F.3d 722, 734 (8th Cir. 2001) ("[The Supreme Court's] emphasis on the predictive aspects of an anonymous tip may be less applicable to tips purporting to describe contemporaneous, readily observable criminal action.").

The tip in this case is slightly less specific than the one in *Rose*—namely, there were no details given about the individual suspect or the gun that was seized—and the tipster in *Rose* used 911; but just because "all of the factors" do not favor the government does not mean the seizure was unlawful. Like the informant in *Rose*, the tipster here gave similar information to dispatch in a comparable context. He told police "that there was a gold Toyota Corolla . . . at the pavilion [in Glen Arbor Park] doing a re-up, giving drugs to the transients that deal in that park."[8] That clears the low bar for reasonable suspicion.

Wright instead relies on out-of-circuit *United States v. Watson*, 900 F.3d 892 (7th Cir. 2018). There, an anonymous tipster reported that some "boys" were playing with guns in a parking lot. *Id.* at 893. As here, there was no traceable 911 call in *Watson* because the witness used a stranger's phone to call the police. So the court found *Navarette* inapposite and held that the tip was not reliable. But the absence of a traceable 911 call was not the only distinction between *Watson* and *Navarette*. The Seventh Circuit also noted that "the tip in *Navarette* reported conduct that the officers reasonably suspected to be criminal," whereas "the caller's report in [*Watson*] about the presence of guns did not create a reasonable suspicion of an ongoing crime, because carrying a firearm in public is permitted with a license in Indiana." *Id.* at 895. But this case is more like *Navarrette* than like

---

[8] The tipster here also gave slightly more information than the tipster in *Rose* did about his relation to the observed events (intimating that he lived nearby, for example, and that drug dealing in the park was a recurrent problem). Wright protests that the tipster did not make those things clear in his actual tip, but only in ancillary testimony at the suppression hearing. But even the dispatcher's call summary log suggests that the tipster was "on scene" and that he claimed it was "*his* park." The tipster emphasized the same things at the suppression hearing and intimated that drug dealing was ongoing. The district court also interpreted the tip to say that the vehicle was parked next to the tipster's home. *Wright*, 2023 WL 1928221, at *5.

*Watson* because the tipster reported obviously criminal activity, and the criminal activity was potentially ongoing.

Based on *Navarette* and our ensuing circuit precedent, the tip established Jakobsohn's reasonable suspicion.

3.

The foregoing analysis depends on the collective knowledge of all the police officers involved. As Wright points out, Jakobsohn did not know all of the facts supporting reasonable suspicion. Although the dispatcher knew that the tipster claimed to witness drug dealing, Jakobsohn received only the conclusory summary that a tipster had reported "drug dealers" in Glen Arbor Park. But under our circuit's "collective knowledge doctrine," information known by one officer can be imputed to another when assessing whether police had legal basis for a seizure. *United States v. Zuniga*, 860 F.3d 276, 282–83 (5th Cir. 2017).

Wright responds that the dispatcher's knowledge of the tip cannot be transferred to Jakobsohn because the dispatcher did not have enough information to establish reasonable suspicion on her own. Wright suggests that the collective knowledge doctrine does not apply unless at least one officer has all of the information necessary to establish reasonable suspicion.

The applicability of the collective-knowledge doctrine, however, depends on which *version* of the doctrine we are referring to. "What has been loosely labelled the collective knowledge doctrine" actually refers to "two distinct types of cases." *United States v. Webster*, 750 F.2d 307, 323 (5th Cir. 1984). *First*, cases "where the arresting officer has no personal knowledge of any of the facts establishing probable cause, but simply carries out directions to arrest given by another officer who does have probable cause." *Id.* (emphasis removed). On that version of the collective-knowledge doctrine, if the ordering officer does not have reasonable suspicion, then the orderee

officer does not have reasonable suspicion either.  *See Alvarez*, 40 F.4th at 352.  But there is a *second* type of collective-knowledge case, where "the arresting officer has personal knowledge of facts which, standing alone, do not establish probable cause but, when added to information known by other officers involved in the investigation, tips the balance in favor of the arrest." *Webster*, 750 F.2d at 323.

Wright is correct that this is probably not the first type of case.  For one thing, it is not clear that the dispatcher ordered Jakobsohn to initiate a stop; the tip was merely relayed to her from dispatch.  A lieutenant may have ordered the dispatch to go out to Jakobsohn, *Wright*, 2023 WL 1928221, at *2, but it is not clear—based on the transcript—whether Jakobsohn was receiving an order or whether she had discretion to act on the tip.  Additionally, it is not obvious that either the dispatcher or any supervising lieutenant had reasonable suspicion to seize Wright on his own.  Neither had confirmed any details of the tip themselves; they had only received the anonymous tip over the phone.

Instead, this is the second type of collective-knowledge case.  Multiple police officers received information, and neither *A*'s nor *B*'s information was independently sufficient to constitute reasonable suspicion, but *A* and *B* are in communication, and the combination of *A*'s + *B*'s information justified a stop.

Here, the dispatcher (*A*) knew of the reliability-enhancing details of the tip under *Navarette*, including that it was an eyewitness account of ongoing or recently completed drug dealing, along with the specific locational details.  Jakobsohn (*B*) knew some of those details along with the aspects of the tip she visually confirmed at the scene.  And both the dispatcher and Jakobsohn were in communication.  The "laminated total of the information known by officers who are in communication with one another" (*A* + *B*)

therefore amounted to reasonable suspicion. *Webster*, 750 F.2d at 323 (quotation omitted).[9]

Indeed, the second version of the doctrine is especially applicable in the anonymous-tip context. When police receive an anonymous tip and relay that information to officers in the field, the dispatcher will be unable to corroborate the tip in the field. That means the dispatcher will often lack independent reasonable suspicion to authorize a stop. But once another officer corroborates the tip or learns additional information supporting its reliability, he or she might obtain the final puzzle pieces supporting reasonable suspicion.[10]

_____

[9] *Accord United States v. Kye Soo Lee*, 962 F.2d 430, 436 (5th Cir. 1992) ("[W]here the arresting officer has personal knowledge of facts which standing alone do not establish probable cause for an arrest but, when added to information known by other officers involved in the investigation, [it] tips the balance in favor of the arrest.").

We have applied that version of the collective knowledge doctrine in the *Terry* stop context. In *United States v. Gonzalez*, 637 F. App'x 136, 137 (5th Cir. 2016) (per curiam), for example, an officer made a *Terry* stop based on a tip that was relayed to him. We explicitly rejected the proposition that "a single officer must be fully aware of all of the facts needed to justify an investigatory stop." *Id.* Instead, "probable cause could be formed from the information in the possession of the arresting officers added to the information possessed by the other officers with whom they were in communication." *Id.*; *see also United States v. Sierra*, 294 F. App'x 884, 889 (5th Cir. 2008) (per curiam) (explaining why officers had reasonable suspicion to extend a *Terry* stop based on their collective knowledge).

[10] *Cf. United States v. Nieto*, 510 F.2d 1118, 1120 (5th Cir. 1975) (finding probable cause where a "tip passed from the informant . . . [through two officers] to [another officer], who searched the car. The tip was corroborated when the location, appearance, and occupants of the car were found to correspond exactly to it. The collective knowledge of this closely coordinated team of drug agents can be attributed to the seizing officer on the scene.").

Other circuits have agreed. *See, e.g.*, *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1118 (9th Cir. 2003) (holding that a police "dispatcher's knowledge is properly considered as part of our analysis of reasonable suspicion" even where the information was "distilled and paraphrased" when transferred to the arresting officer); *see also United States*

No. 21-40849

Based on *Webster* and its progeny, we can comfortably apply the second version of the collective-knowledge doctrine here. We can consider both what the dispatcher knew and what Jakobsohn confirmed at the scene. Taking that information together, the tip passes muster under *Navarette* and *Gomez*.

B.

If there were any doubt about the tip's reliability, however, it is important to remember that the tip was not the only basis for the *Terry* stop. There was a second factor supporting reasonable suspicion: The area was known for the precise type of criminal activity alleged in the tip.

Jakobsohn testified at the suppression hearing that she often patrolled the corridor near Glen Arbor Park. In a ten-hour shift, she would receive three to four calls coming from the area. Those calls mostly regarded "drug users in that area . . . show[ing] signs of public intoxication," "drug dealers in the area," and "a lot of homeless." The anonymous tip was consonant with her concerns about the area, as it reported drug dealing at Glen Arbor Park to "transients."

Although Wright suggests that we should give little weight to the fact that this was a high-crime area, that gives short shrift to Supreme Court and Fifth Circuit precedents. "[T]he fact that [a] stop occurred in a 'high crime area'" is "among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). That is especially true when a high-crime area is combined with other suspicious behavior. *United States v. Michelletti*, 13 F.3d 838, 844 (5th Cir. 1994) (en banc).

---

*v. Cutchin*, 956 F.2d 1216, 1217–18 (D.C. Cir. 1992) (noting that officers may rely on a dispatcher's report "even though they cannot vouch for it").

16

No. 21-40849

Certainly, "one's physical proximity to suspicious persons" should not subject him to search. *Id.* at 849 (Smith, J., dissenting). "[A] person's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *United States v. McKinney*, 980 F.3d 485, 492 (5th Cir. 2020) (quotation omitted). But here, the high-crime area did not stand alone. Wright's presence in a park known for drug crimes was bolstered by an anonymous tip linking him to the exact type of crime familiar to the officer and frequent in the area.

## C.

Third and finally, Jakobsohn became justifiably concerned when she pulled behind Wright and he opened his car door. In *United States v. Goodin*, 835 F. App'x 771, 780 (5th Cir. 2021), we reasoned that there was reasonable suspicion when a defendant "immediately exited his vehicle upon being pulled over." It made the police officer's "'hair stand up' because it presented safety concerns and suggested [the defendant] was trying to keep [the officer] away from the car." *Id.* Although that case dealt with a prolonged traffic stop instead of the justification for an initial seizure, the suspiciousness of the behavior is equally relevant. As in *Goodin*, Wright's confusing and alarming attempt to exit the vehicle supports reasonable suspicion.

Wright asks that we ignore his evasive behavior after Jakobsohn arrived because we previously held that the seizure occurred as soon as Jakobsohn pulled behind Wright.

Not so. We specifically held that the seizure occurred "when Officer Jakobsohn pulled behind his parked vehicle with the emergency lights engaged on her patrol vehicle *and* almost simultaneously ordered him to remain in his vehicle, which he instead stood beside." *Wright I*, 57 F.4th at 533 (emphasis added). Of course, none of Wright's post-seizure conduct

17

can contribute to reasonable suspicion—a seizure must be "justified at its inception." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). But before Jakobsohn ordered Wright to remain in his vehicle, Wright started to exit the car, even though there was a police car behind him with flashing lights. Wright's furtive movement was what prompted Jakobsohn to make the command in the first place. That adds a final quantum of suspicion to an already suspicious situation, fully justifying Jakobsohn's investigatory stop.

### III.

The Fourth Amendment is not an insuperable barrier to legitimate police work. When conducting a brief investigatory detention, an officer just needs "reasonable suspicion" that crime is afoot. That is a low threshold, requiring only "some minimal level of objective justification." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)).

Officer Jakobsohn had that here. The contemporaneous tip, the visual details that Jakobsohn confirmed, the high-crime area, and Wright's evasive response to police presence were enough to give an officer articulable suspicion that crime was occurring (or was about to occur). To conclude otherwise would raise the bar of reasonable suspicion and hamper law enforcement from engaging in essential investigatory actions.

The district court properly denied Wright's motion to suppress. The judgment of conviction is AFFIRMED.

No. 21-40849

Rhesa Hawkins Barksdale, *Circuit Judge*, dissenting:

My esteemed colleagues hold the Officer possessed the requisite reasonable suspicion to seize Wright by their combining four factors: the anonymous tip; the collective-knowledge doctrine; the stop's occurring in a high-crime area; and Wright's opening his vehicle door as the stop was occurring. Maj. Op. at 18. In short, without each of these four factors' being applicable, the requisite "articulable suspicion that crime was occurring (or was about to occur)", *id.*, is lacking. This house of cards collapses based on each factor's erroneous application. I respectfully dissent.

I.

Our opinion earlier this year ordered a limited remand to district court for supplemental findings of fact and conclusions of law, as a result of our holding Wright was seized when "the Officer pulled behind Wright's parked vehicle with the emergency lights engaged on her patrol vehicle and almost simultaneously ordered him to remain in his vehicle". *United States v. Wright*, 57 F.4th 524, 535 (5th Cir. 2023) (*Wright I*). Because the district court had concluded the *Terry* stop was initiated later than that point in time, we instructed the court to prepare, based *only* on the record developed at the 24 June 2021 suppression hearing, "written findings of fact and conclusions of law on whether reasonable suspicion existed when the Officer pulled behind Wright and ordered him to remain in his vehicle". *Id.* at 536. (For the limited remand, the parties did not submit briefs to the district court.)

A.

Therefore, the following recitation of relevant facts is based on the record developed at the 2021 suppression hearing, including testimony at the hearing, as described in *Wright I*, 57 F.4th at 527–31.

19

The Corpus Christi, Texas, Police Department (CCPD) on 15 July 2020 (at "about 4:30 in the afternoon") received an anonymous "suspicious vehicle call" regarding a vehicle in the Glen Arbor Park area near Tanglewood Drive and Bonner Drive in Corpus Christi. Glen Arbor Park and the surrounding neighborhood are part of a corridor of problem areas where drugs are sold; in response to this activity, officers had been responding to a few calls in this area every shift.

As a result of the call to CCPD, Officer Jakobsohn at 4:34 p.m.—about four minutes after the anonymous call was made—received an incident "call-out". The Officer testified the dispatcher (dispatch) told her "there was a suspicious vehicle in the area of the Glen Arbor Park near Tanglewood [Drive] and Bonner [Drive]", and directed her to respond. Dispatch also transmitted information regarding the anonymous call to the Officer's in-vehicle computer (call summary or call-log report generated by dispatch).

Within minutes after receiving the call-out, the Officer located a gold Toyota Corolla parked on Bonner Drive, across the street from the park; executed a three-point-turn; and pulled behind the vehicle, engaging her patrol vehicle's red and blue emergency lights. As the Officer parked her vehicle, she saw the driver's door open on the Corolla; and, as she exited her vehicle, she commanded the driver—later identified as Wright—three times to "stay in [his] car". Approximately 30 seconds elapsed from the time the Officer spotted a vehicle appearing to match the information to when she initially engaged with Wright.

At the 24 June 2021 suppression hearing, held approximately 11 months after the 15 July 2020 incident, the Government presented a map of the area, the dashboard and body-cam videos, and only two witnesses: the Officer; and Michael David Smith, whom officers had not identified as the

anonymous caller until the prior week through knocking on doors in the area. Wright presented only the call summary.

## B.

In *Wright I*, we held Wright was seized when the Officer, with emergency lights engaged, pulled behind Wright's parked vehicle, and he did not attempt to flee or terminate the encounter, but failed to comply fully with the officer's commands. *Wright I*, 57 F.4th at 532–33. Because the district court—ruling from the bench at the suppression hearing—had concluded the *Terry* stop had been initiated at a later point in the encounter, its findings and conclusions were inadequate for our deciding whether reasonable suspicion existed at the earlier point in time when the seizure occurred. Accordingly, on 18 January 2023 we remanded on a limited basis for the district court to prepare supplemental findings of fact and conclusions of law, based on the record developed at the 2021 suppression hearing, for whether reasonable suspicion existed when "Officer Jakobsohn pulled behind [Wright's] parked vehicle with the emergency lights engaged on her patrol vehicle and almost simultaneously ordered him to remain in his vehicle". *Id.* at 533.

## C.

On 9 February 2023, the district court issued its supplemental findings and conclusions. *United States v. Wright*, No. 2:20-CR-01444, 2023 WL 1928221, at *1 (S.D. Tex. 9 Feb. 2023). The court explained the following gave rise to reasonable suspicion: the reliability and verification of the anonymous vehicle report; Wright's exiting his vehicle; his presence in a high-crime area; and the collective-knowledge doctrine. Additionally, it clarified that, despite its having stated at the 2021 suppression hearing "I'm not really sure that [the] anonymous caller helped [the Government] out very much", it found credible the caller's testimony at the hearing. *Id.* at *8–9.

No. 21-40849

## II.

After receiving the supplemental findings and conclusions, we required supplemental briefing to assist our review. When reviewing the denial of a suppression motion, factual findings are reviewed for clear error; conclusions of law, *de novo*. *United States v. Smith*, 952 F.3d 642, 646 (5th Cir. 2020). "The conclusions of law derived from a district court's finding of fact, such as whether a reasonable suspicion existed to stop a vehicle, are reviewed *de novo*." *United States v. Inocencio*, 40 F.3d 716, 721 (5th Cir. 1994). Viewing the evidence in the requisite light most favorable to the prevailing party (here, the Government), a district court's ruling will be upheld "if there is any reasonable view of the evidence to support it". *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014) (citation omitted).

"One of the most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of those witnesses." *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation omitted). Accordingly, when, as in this instance, live testimony forms part of the basis for denial of a suppression motion, our clearly-erroneous standard is "particularly strong" because the "judge had the opportunity to observe the demeanor of the witnesses". *Id.* (citation omitted). Conversely, video recordings, as in this instance, are given a presumption of reliability and significant evidentiary weight because "[a]n electronic recording will many times produce a more reliable rendition . . . than will the unaided memory of a police agent". *United States v. White*, 401 U.S. 745, 753 (1971). Accordingly, where testimony conflicts with video evidence, our court must view the "facts in the light depicted by the videotape". *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

22

No. 21-40849

"Reasonable suspicion is a low threshold, requiring only a minimal level of objective justification.  But it must be founded on specific and articulable facts rather than on a mere suspicion or hunch."  *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022) (citations omitted).

## A.

In its supplemental findings and conclusions, the district court outlined the events leading up to the stop (as identified in *Wright I*) and concluded reasonable suspicion existed for it.  Such suspicion "is dependent upon both the content of the information possessed by police and its degree of reliability".  *Alabama v. White*, 496 U.S. 325, 330 (1990).

Although a tip need not necessarily contain predictive information to establish reasonable suspicion, certain factors may be considered in deciding whether the tip provided a sufficient basis.  *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010).  Those factors are:

> (1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or report concerns active or recent activity or has instead gone stale.

*Id.* (citing *United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007)).

Therefore, the initial question in determining whether the Officer possessed reasonable suspicion is to assess whether the anonymous call was "sufficiently reliable to credit the allegation" that Wright was involved in drug activity at the time of that call.  *Navarette v. California*, 572 U.S. 393, 398 (2014).

At the suppression hearing, the very-recently-identified caller testified that, in the call, he reported "there was a gold Toyota Corolla that was at the pavilion doing a re-up, giving drugs to the transients that deal in

that park and that they needed to come there and get them out of [the] park". Based on the call, the dispatcher told the Officer "there was a suspicious vehicle in the area of the Glen Arbor Park near Tanglewood [Drive] and Bonner [Drive]", and directed her to respond. Dispatch also transmitted information regarding the call to the Officer's in-vehicle computer (call summary or call-log report generated by dispatch).

It goes without saying that we do not assess the credibility of the caller's suppression-hearing testimony. *E.g.*, *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005). Nevertheless, the *tip* was not sufficiently reliable. *E.g.*, *United States v. Rose*, 48 F.4th 297, 303 (5th Cir. 2022) (explaining *Navarette* factors can, when taken together, "support a decision by law enforcement to credit the reliability of anonymous tips").

An anonymous tip may be found reliable when "the informant (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing and voice recording". *Id.* (citing *Navarette*, 572 U.S. at 398–401). The following findings and conclusions are from those by the district court on limited remand.

First, the court concluded the caller provided eyewitness knowledge of the event because he reported "criminal and drug dealing activity he was witnessing right outside his home". *Wright*, 2023 WL 1928221, at *5. In *Navarette*, the Court ruled the caller reported eyewitness knowledge of alleged criminal conduct when she reported "she had been run off the road by a specific vehicle—a silver Ford F–150 pickup, license plate 8D94925". *Navarette*, 572 U.S. at 399 (citing *Illinois v. Gates*, 462 U.S. 213, 234 (1983) ("[An informant's] *explicit and detailed description* of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case". (emphasis added))).

The *Navarette* Court noted the tip at issue was in contrast with *Florida v. J.L.*, "where the tip provided no basis for concluding that the tipster had actually seen the gun". *Id.* (citing 529 U.S. 266, 271 (2000)).

Here, and relative to *Navarette* and its comparison to *J.L.*, the then-anonymous caller's general testimony, 11 months after his call, about drug dealers in the park doing a "re-up" does not constitute detail amounting to eyewitness knowledge of criminal conduct.  Absent from the facts at issue is any detail regarding:  vehicle occupants, license plate number, number of people at the car, amount of time the car was in the park, etc.  The caller did, however, provide detail regarding his ability to take matters into his own hands, testifying he "told [dispatch] that [he] had [his] AR-15 locked and loaded with 31 rounds of armor-piercing weaponry and that if [he] needed to, [he] could do [the police officers'] job for them".  *Cf. United States v. Aviles-Vega*, 783 F.3d 69, 76–77 (1st Cir. 2015) (noting the court looks to the "totality of the circumstances" in assessing whether "a personal grudge or other ill-intended purpose motivated" the anonymous tip); *United States v. Copening*, 506 F.3d 1241, 1247 (10th Cir. 2007) (finding anonymous caller's actions of "reporting . . . events to 911 dispatch, detailing what he observed, following the vehicle, and updating dispatch regarding the truck's location, bespeak an ordinary citizen acting in good faith").

The district court explained that these above-quoted details reflect the caller's frustration, *Wright*, 2023 WL 1928221, at *2; and the majority notes the "tipster's threat had an uncertain effect on the tip's reliability", but that the Government suggested the caller "would not have made such an excited utterance unless he actually witnessed an emergency", Maj. Op. at 8.  The caller, however, never testified this statement was made from frustration, nor that it was in response to an emergency or imminent personal threat; rather, when questioned about what he "might do if [officers] don't take care of the

problem", he answered with the above-quoted threat. *Contra Navarette*, 572 U.S. at 404 (assessing emergency tip involving drunk driver where "a second chance for dangerous conduct could have disastrous consequences").

Second, the court found "the caller made the suspicious vehicle report at the time the conduct was actually occurring, and not sometime later". *Wright*, 2023 WL 1928221, at *6. Pursuant to our reviewing findings for clear error, I must accept this finding because it is "plausible based on the record as a whole". *United States v. Lord*, 915 F.3d 1009, 1017 (5th Cir. 2019).

Third, the court did not clearly err in finding: that the caller did *not* use the 911 system; and that this factor cuts against the Government. *Wright*, 2023 WL 1928221, at *6.

Balancing these factors, the district court concluded the first and second factors established that the tip "bore adequate indicia of reliability"; and, because "Officer Jakobsohn generally knew the information provided by the caller because of a radio-call out from dispatch describing the call as well as the information included in the call summary log", the tip "weigh[ed] in favor of finding reasonable suspicion" existed. *Id.* Our court has not held whether any one *Navarette* factor is dispositive. The majority relies on out-of-circuit *Aviles-Vega*, 783 F.3d at 76–77, to reach a conclusion that the caller's failing to use the 911 system is not detrimental. Maj. Op. at 8.

It should be noted that, contrary to the tipster's call in the instant case, the anonymous caller in *Aviles-Vega* provided a far more detailed tip to an officer working as a desk sergeant. *Id.* at 72. As testified to by the officer who received the call, the caller reported that "four individuals in a wine-colored Chevrolet Lumina, with a license plate ending in 959 and a broken right side tail light, were traveling from Isabela to Aguadilla along Road 2"; and the caller stated he "observed that, as the Lumina drove in the direction of Aguadilla, the front passenger passed a firearm to one of the individuals

sitting in the back". *Id.* at 72 & n.1. Additionally, prior to seizing the individuals, officers in an unmarked police vehicle observed the reported vehicle and corroborated the detailed information. *Id.* at 72.

Although the majority seeks to differentiate countervailing authority, it discredits the circuit split recognizing the critical importance of the 911 system's tracing abilities. Maj. Op. at 12–13; *see United States v. Watson*, 900 F.3d 892, 895–96 (7th Cir. 2018) ("First and *most significantly*, *Navarette*'s rationale for deeming 911 calls reliable has much less force here . . . [because] the caller borrowed a stranger's phone, limiting the usefulness of the system's tracing ability". (emphasis added)); *Beal v. Beller*, 847 F.3d 897, 905 (7th Cir. 2017) (explaining, in civil context, evidence did not show the call was made to a 911 system; therefore, the call lacked tracing capabilities and was insufficient to "trigger *Navarette*'s rule").

And, the majority attempts to distinguish the case before our panel from *Watson* by emphasizing the Seventh Circuit's distinction between calls pertaining to conduct suspected to be criminal and conduct not *per se* criminal. *Watson*, 900 F.3d at 895–96. The Seventh Circuit's focus in *Watson*, however, was, "most significantly", the caller's failing to use the 911 system. *Id.*

Despite our court's not previously addressing whether a single *Navarette* feature is dispositive, that issue does not need to be reached here. The caller's failure to utilize the 911 system *and* his vague tip undermine the district court's finding of reliability.

The caller's failure, under these facts, to use the 911 system has a trickle-down effect which has resulted in an incomplete record concerning what was reported to dispatch. Again, accepting the caller's suppression-hearing testimony as credible, it lacks contemporaneous eyewitness knowledge and details which may have been stated to the dispatcher but were

lost in memory over the 11-month period between the call and the caller's not being identified until the week before the suppression hearing.

"If a tip is provided by an anonymous informant, such that the informant's credibility and reliability cannot be determined, the Government must establish reasonable suspicion based on the remaining [three] factors." *Gomez*, 623 F.3d at 269. The district court did not consider these remaining factors, listed *supra*: "the specificity of the information contained in the tip or report"; "the extent to which the information in the tip or report can be verified by officers in the field"; and, "whether the tip or report concerns active or recent activity or has instead gone stale". *Id.* (citing *Martinez*, 486 F.3d at 861). For the following reasons, they cut against the Government.

First, where an anonymous caller provided "highly specific" detail, this court has held this factor leaned in favor of the Government. *Rose*, 48 F.4th at 304 (noting anonymous tipster provided: "make, model, and color of the car; its location in the parking lot of a particular liquor store, beside the building next to a trash can; the suspect's race, sex, and clothing, even down to the style and color of his shoes; the threatening interaction with the person in the passenger seat, including the apparent passage of pills between them; and unique details about the gun involved").

The majority is mistaken in stating the tipster in the case before our panel provided only "slightly less" information than the one in *Rose*. *E.g.*, *id*; *see* Maj. Op. at 12. Here, and as stated *supra*, the caller testified he told dispatch: "there was a gold Toyota Corolla that was at the pavilion doing a re-up, giving drugs to the transients that deal in that park and that they needed to come there and get them out of [his] park". *Wright*, 2023 WL 1928221, at *6. The caller did not provide any details regarding the suspects or specifics regarding the alleged "re-up", such as any description of the

"transients" he observed engaging with the suspected vehicle or the passengers of the vehicle.

Next, when the Officer received the call-out regarding a suspicious vehicle, she did not hesitate to initiate a *Terry* stop upon locating what could potentially be the vehicle in question. The Officer testified that her normal procedure "on this type of call" is to "make contact with the occupants of the vehicle since it matched the description just to kind of talk to them, get a feel for what they're doing there". This does not appear to be the procedure followed here.

The Officer did not stop to observe any criminal activity or conduct any surveillance to observe whether any individuals approached the vehicle. Whereas in *Rose*, the "information conveyed by the informant was mostly consistent with what the officers discovered when they arrived on the scene", the caller's tip here—conveyed through the call summary, as reflected in his suppression-hearing testimony—directed the Officer to the presence of a vehicle parked legally during daylight, with no one by it. *Rose*, 48 F.4th at 304.

This court in *Rose* clarified what type of corroboration is necessary, explaining that *Florida v. J.L.* "sets forth a rule that officers must corroborate anonymously reported criminal activity when the tip itself lack certain indicia of reliability", but that this corroboration is not mandated in every instance. *Rose*, 48 F.4th at 305 (citing 529 U.S. 266). When an "anonymous tip—from an unknown location by an unknown caller" gives no indication how or why he knows of criminal activity, the putative criminal activity must be corroborated. *Id.* This is particularly true where the alleged criminal activity is concealed. *Id.* But when an anonymous caller provides details regarding the criminal activity and how he knew of it, the standard for corroboration is more relaxed. *Id.*

No. 21-40849

According to both the caller's suppression-hearing testimony and the call summary, the caller did not provide his address nor specific details regarding the alleged activity at the time of the call. Whereas the caller testified he told the dispatcher he observed the vehicle "doing a re-up" and "giving drugs to the transients", the Officer testified the call summary instructed her that there were, "suspicious people at the location, via drug dealers, driving cars at location". The caller did not provide his address during the call; instead, he testified at the suppression hearing that officers "needed to come there and get them out of [his] park". Similarly, the call summary stated that officers needed to "get these drug dealers out of his park". These facts called for corroboration by the Officer. *Id.*

Finally, and slightly in favor of the Government, is the tip's detailing alleged recent activity. Because the Officer arrived at the area approximately ten minutes after the caller made the suspicious-vehicle call, the described suspicious activity was recent. *Id.*

B.

After ruling the tip established reasonable suspicion, the district court and majority turn to the collective-knowledge doctrine to piece together the tip and the call summary, as two of the four combined factors permitting the Officer to seize Wright. Maj. Op. at 13–16.

In a footnote in its brief to our court in *Wright I*, the Government—for the first time on appeal—maintained the collective-knowledge doctrine permitted our considering the information communicated to the dispatcher for purposes of evaluating the Officer's reasonable suspicion. In other words, that position had not been raised at the suppression hearing. *Wright I* did not address that doctrine.

30

No. 21-40849

On remand, as discussed *supra*, we instructed the district court to consider only the record developed at the 2021 suppression hearing in order to provide written findings and conclusions clarifying whether reasonable suspicion existed for the earlier stop. *Wright I*, 57 F.4th at 536. Instead, the court found facts the Government never sought to prove and reached a new conclusion on those facts. *See United States v. Raney*, 633 F.3d 385, 392 (5th Cir. 2011) ("[T]he suppression hearing provided the [G]overnment the opportunity and obligation to present evidence establishing the validity of the traffic stop. . . . We will not afford the [G]overnment a second opportunity to present evidence to the district court in an attempt to meet their burden of proof".).    Additionally, the court had not considered the collective-knowledge doctrine at the suppression hearing, in part "believ[ing] . . . it was limited to considering only the contents of the call summary log, not the actual statement made by the caller to dispatch". *Wright*, 2023 WL 1928221, at *8.

The court, however, incorrectly interpreted the limited remand as an opportunity to add to what the Government sought to prove at the suppression hearing.  This, especially without additional input from the parties, greatly altered the playing field and violated principles of fundamental fairness.  "Though we may affirm on an alternative basis, the decision to do so is discretionary", and we should decline to affirm on a basis for which defendant lacked an opportunity to develop a position in district court. *United States v. Hankton*, 875 F.3d 786, 793 (5th Cir. 2017).  Courts ordinarily "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present". *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)).

In any event, both the district court and the majority incorrectly apply the collective-knowledge doctrine in this context. Fatal factual flaws prevent its application.

As noted by the majority, one version of the collective-knowledge doctrine applies where "*the arresting officer* has personal knowledge of facts which, standing alone, do not establish probable cause but, when added to information known by *other officers involved* in the investigation, tips the balance in favor of the arrest". *United States v. Webster*, 750 F.2d 307, 323 (5th Cir. 1984) (emphasis added); Maj. Op. at 14. Instead of accepting the plain language of our case law, the district court and majority stretch the facts, ignoring two major flaws.

First, and for the reasons discussed *supra*, the information the caller testified he provided the dispatcher, combined with the information conveyed to the Officer, is insufficient to establish articulable facts supporting reasonable suspicion. *E.g.*, *United States v. Hensley*, 469 U.S. 221, 232 (1985). Further, even combined with the dispatch call summary, the anonymous tipster's testimony—provided almost a year after his call—is insufficiently reliable absent a recording of the call or testimony from the dispatcher, which, again, was not presented at the suppression hearing, in establishing what was known to the unidentified dispatcher at the time of the suspicious-vehicle report. Even if the testimony and call summary gave rise to reasonable suspicion, the basis for any suspicion is unreliable.

Second, the district court and majority make a blind leap from the testified facts to their reliance on the dispatcher as an "officer". *Wright*, 2023 WL 1928221, at *7–8; Maj. Op. at 13–16. Again, for the suppression hearing, the Government failed to present the dispatcher who received the call. Rather, the extent of testimony regarding procedure for receiving a

suspicious-vehicle call and executing a call-out was the following by the Officer:

> THE COURT: Okay. So, when a 9-1-1 call comes in, who makes the decision to actually send someone like you out to investigate? Is that the 9-1-1 call center or do you make that?
>
> THE [OFFICER]: Well, dispatch decides. Then, once beyond that point, our lieutenant will decide. If there's any kind of question, dispatch will ask for the lieutenant, you know, should we send someone out, should we not.

In considering the above colloquy, it bears repeating that, on limited remand, the court found the call was not a "911 call".

Critically, there is no evidence regarding the dispatcher. The record does not identify who the dispatcher was, nor did the Government attempt to show his or her qualifications. To find or assume dispatch was a law enforcement officer is clear error.

Although we have not previously addressed this specific issue, other courts have grappled with the collective-knowledge doctrine when one of the individual's possessing information is a civilian 911 operator. The Second Circuit in *United States v. Colon* held, that where "the record here contain[ed] no evidence of whether . . . the operator taking the call was capable of determining whether reasonable suspicion for the stop and frisk existed", the information conveyed was not imputed to law enforcement. 250 F.3d 130, 134–35, 137 (2d Cir. 2001). Similarly, the Seventh Circuit has provided that the collective-knowledge doctrine "applies to information that an officer receives from those with the training, responsibility or authority to make a determination of reasonable suspicion". *United States v. Eymann*, 962 F.3d 273, 284 (7th Cir. 2020) (citation omitted).

Further, as the majority concedes, the record is equally lacking regarding the possible involvement of a "lieutenant", as referenced in the Officer's testimony. *See* Maj. Op. at 14. Again, only approximately four minutes elapsed from the time the caller made the suspicious-vehicle call to the time the call-out was made to the Officer. It is unlikely that, in addition to taking the call, issuing the call-out, and contemporaneously recording the call summary, a lieutenant was consulted. To follow the majority's logic wrongly expands the collective-knowledge doctrine.

Without application of collective knowledge, the extent of review for whether the tip was reliable is limited to the insufficient information contained in the call summary.

## C.

Because the collective-knowledge doctrine is inapplicable, and because the call summary based on the unreliable tip failed to provide the Officer with reasonable suspicion, any findings regarding Wright's exiting his vehicle and his being in a high-crime area are insufficient to establish reasonable suspicion. Although the unreliable anonymous tip is determinative, these two factors—Wright's presence in a high-crime area and his exiting his vehicle—are addressed in order to respond to the majority opinion. Again, the majority combines all four factors in order to hold the requisite reasonable suspicion existed. Maj. Op. at 18.

### 1.

The district court found that Glen Arbor Park was known as "a high crime area with heavy drug dealing and use". *Wright*, 2023 WL 1928221, at *6; *see United States v. Michelletti*, 13 F.3d 838, 844 (5th Cir. 1994) (en banc). Even with the Officer's knowledge of the surrounding area as a neighborhood

No. 21-40849

with drug activity, this is insufficient to consider in deciding reasonable suspicion existed.

As noted in *Michelletti*, "[t]he location in which suspicious behavior occurs, like the time of day, is among the facts that generate reasonable inferences as to the necessary police response to the behavior". 13 F.3d at 844. This further supports that, although location is a factor in the analysis, "a person's presence in an area of expected criminal activity, *standing alone*, is not enough to support a reasonable, particularized suspicion that the person is committing a crime". *United States v. McKinney*, 980 F.3d 485, 492 (5th Cir. 2020) (citation omitted) (emphasis added).

Minutes after receiving the report from dispatch, the Officer arrived on the scene and neglected to conduct any surveillance of the vehicle prior to seizing Wright. Our en banc court in *Michelletti* reemphasized our court's conclusion in *United States v. Rideau* that, in factoring in the location of a seizure, our court "look[s] to the reality that the setting in which the police officer acts may reasonably and significantly affect his decisional calculus". *Michelletti*, 13 F.3d at 844 (quoting *Rideau*, 969 F.2d 1574, 1576 (5th Cir. 1992) (en banc)).

Even taking into consideration the Officer's awareness of the area as one known for drug dealing and transient activity, these facts are distinguishable. Unlike defendant in *Michelletti*, whom the officer believed was committing an alcoholic-beverage offense as he exited a bar at 2:00 a.m., *id.* at 841; *see also Rideau*, 969 F.2d at 1574 ("Since public intoxication is a criminal offense under Texas law, the officers had adequate grounds for a stop."), Wright's vehicle was legally parked on the street at approximately 4:30 p.m. on a bright day. In answer to a question by the court at the suppression hearing, the Officer testified that, absent the tip providing the

35

description of Wright's vehicle, she "wouldn't have been approaching that vehicle in the first place".

The majority maintains Wright's presence in Glen Arbor was coupled with suspicious behavior, citing the anonymous tip linking him to the type of crime that arises in that area. *See* Maj. Op. at 16–17. As discussed *supra*, the anonymous tip is not reliable, and the Officer did not observe any activity consistent with drug activity.

2.

As shown in the Officer's dashboard-camera video, within an approximately ten-second window, the Officer engaged her emergency lights, Wright opened his vehicle door, and the Officer calmly instructed Wright for the first time to stay in his vehicle. But, the Officer testified: she found it unusual to see the driver's door opening; and Wright's exiting the vehicle was "kind of an aggressive approach".

As stated *supra*, we view the "facts in the light depicted by the videotape". *Scott*, 550 U.S. at 380–81. The Officer's dashboard-camera video shows Wright slowly exiting his vehicle almost simultaneously with when the Officer pulls her vehicle behind his. He turns to face the Officer with his arms extended at mid-chest level, with the palms of both of his hands facing her, and calmly states "Ma'am, I haven't done anything". He did not lunge towards the Officer, nor did he make any threatening or evasive movements.

To that point, though, Wright's exiting his vehicle occurred almost simultaneously with when he was seized. Because reasonable suspicion must exist at the time the stop occurs and because, in *Wright I*, we held Wright was seized when the Officer pulled behind him *and* almost simultaneously ordered him to stay in his vehicle, consideration of Wright's exiting his

vehicle is improper. Approximately 30 seconds existed between when the Officer spotted a gold Toyota Corolla, engaged her emergency lights, and almost simultaneously ordered Wright to remain in his vehicle. If there is a distinction to be made regarding the Officer's orders being simultaneous versus *almost* simultaneous with when she pulled up behind him with her emergency lights engaged, it is a distinction without a difference in this context. Accordingly, it is incorrect to consider Wright's exiting his vehicle in the reasonable-suspicion analysis. *E.g.*, *United States v. Flowers*, 6 F.4th 651, 655 (5th Cir. 2021) (explaining seizure "must be justified at its inception" (citation omitted)).

Moreover, unlike the facts of the unpublished opinion the majority cites, the Officer merely thought Wright's exiting the vehicle was *unusual* behavior, and the dashboard-camera video does not depict Wright as aggressive in the moment he exited his vehicle. *Cf. United States v. Goodin*, 835 F. App'x 771, 780 (5th Cir. 2021) ("[Defendant] immediately exited his vehicle upon being pulled over, an action that made [the Officer's] 'hair stand up'".); *see also* 5TH CIR. R. 47.5.4. ("Unpublished opinions issued on or after January 1, 1996, are not precedent"); *see* Maj. Op. at 17–18.

## III.

For the foregoing reasons, I respectfully dissent.